In re L.C.

District of Columbia, Appellant.

Nos. 03–FS–1324, 03–FS–1332, 03–FS–1333, 03–FS–1420, 03–FS–1421, 03–FS–1433.

District of Columbia Court of Appeals.

Argued March 24, 2004.

Decided May 19, 2005.

Rosalyn Calbert Groce, Supervisory Corporation Counsel, with whom Robert J. Spagnoletti, Corporation Counsel, and Edward E. Schwab, Deputy Corporation Counsel, were on the brief, for appellant.*

Giovanna Shay, Public Defender Service, with whom James W. Klein and Jaclyn Frankfurt, Public Defender Service, were on the brief, for appellees.

Before TERRY and FARRELL, Associate Judges, and KING, Senior Judge.

TERRY, Associate Judge.

These consolidated appeals present us with two fundamental issues: (1) whether the trial court can direct placement or order probation as a means of directing treatment after a delinquent juvenile has been committed to the custody of a public agency, and (2) whether the trial court can release a delinquent juvenile who has been committed to the custody of a public agency. The first issue arises in the cases of K.D. and L.C., in which the trial court directed placement and ordered probation. We conclude, in light of the 1993 amendment to D.C.Code § 16–2320(c)(1) (1993 Supp.) and our decision in *In re P.S.*, 821 A.2d 905 (D.C.2003), that the court erred in directing placement and then ordering probation as a means of directing treatment in these two cases. K.A.'s case presents a somewhat different question, because in that case the trial court did not order probation or any further placement or treatment. Instead, the court simply closed the case, thereby effecting K.A.'s release. Given the legislature's repeal of D.C.Code §§ 16–2324(b)-(d) (1993 Supp.) and our previous interpretation of D.C.Code § 16–2322(a)(4) (2001) in *In re P.S.*, we hold that the court did not have the power to close the case and release K.A. The trial court has only limited authority to veto DHS's decision to release a delinquent juvenile, and it cannot exercise that authority unless it has been expressly reserved in the commitment order *and* DHS decides that release is warranted. *See In re P.S.*, 821 A.2d at 911. We therefore reverse all of the orders from which these appeals are taken and remand all of the cases for further proceedings.

I

A. *K.D.'s Case*

On September 23, 2003, K.D. was committed to the custody of the Youth Services Administration ("YSA")[1] of the Department of Human Services ("DHS") until the age of twenty-one.[2] The commitment was restrictive,[3] and the trial court recommended that K.D. remain at Oak Hill Youth Center pending placement "in a residential facility that can provide neurological rehabilitation."[4] However, at a commitment review hear-

---

* While these appeals were pending, the title of the District's chief attorney was changed. The Corporation Counsel is now officially known as the Attorney General for the District of Columbia. *See* Mayor's Order No.2004–92 (May 26, 2004), 51 D.C. Register 6052.

1. YSA is the branch of DHS that is "responsible for community service programs for delinquents ... who are committed to the legal custody of [DHS]." 12 DCMR § 1200.1 (1987).

2. On August 27, 2003, K.D. had pleaded guilty to voluntary manslaughter.

3. The court's order stated that K.D. could be released into aftercare "only by order of the [court]."

4. The court also recommended that K.D. receive individual counseling and an ophthalmological evaluation.

ing on December 1, 2003, the court vacated its original commitment and ordered that K.D. be placed in a shelter home because YSA had not yet placed K.D. in a residential facility. The court explained that the District of Columbia Code gave it the authority to vacate the commitment:

> D.C.Code section 16–2322(c) advises that any other dispositional order may be extended for additional periods of time upon motion of the director of social services if, after notice and hearing, the division, that is, the Court, finds that extension is necessary to protect the interest of the child. Subsection (f) of the same section of the Code begins: unless soon[er] ... terminated, all orders of the division under this subchapter in force with respect to a child terminate when he reaches twenty-one years of age.[5]

The language in those provisions recognizes the Court's authority to extend or terminate disposition orders. Based on the recognition of that authority combined with YSA's apparent inability to provide for the care and rehabilitation of [K.D.], as the law orders them to do, the disposition order entered September 23 is vacated. [K.D.] will be paced in a shelter home [pending a new disposition]. We will continue this matter for disposition.

Counsel for the District of Columbia made an oral motion for reconsideration and/or a stay of the trial court's order, but the court denied the motion and scheduled a new disposition hearing for January 27, 2004.

At an emergency hearing on December 3, 2003, the District asked the court to "vacate its order vacating the respondent's commitment." The District also informed the court that "YSA will be able to place the respondent immediately at Riverside Residential Treatment should the commitment order be reinstated." K.D.'s counsel argued that Riverside was an inappropriate facility and requested that K.D. be placed on probation at the Oak Mountain treatment facility. The District opposed this request, noting that it did not have a contract with Oak Mountain, which is located in Alabama. After hearing from both sides, the court explained why it had vacated the commitment:

> ... Now the whole purpose of the commitment was that ... your agency provide [K.D.] with care and rehabilitation. And yes, there is case law that says that judges no longer can specify what the placement should be. But the Code, [section] 16–2322, recognizes the authority of [the] judge to extend disposition orders and to terminate disposition orders. So the fact that *In re P.S.* was decided has absolutely nothing to do with our ability to extend or terminate disposition orders. You know, it was based on that authority that I vacated the disposition. Because, you know, what, you guys weren't doing anything.

---

5. D.C.Code § 16–2322 (2001) states in part:

   (c) Any ... dispositional order [other than an order involving a neglected child] may be extended for additional periods of one year, upon motion of the Director of Social Services, if, after notice and hearing, the Division finds that extension is necessary to protect the interest of the child.

   ❊   ❊   ❊   ❊   ❊   ❊

   (f) Unless sooner terminated, all orders of the Division under this subchapter in force with respect to a child terminate when he reaches twenty-one years of age.

   References to "the Division" in this and other statutes and rules cited in this opinion refer to the Family Division of the Superior Court.

And you weren't doing anything for financial reasons.

K.D.'s counsel then asserted that the court also had authority to revoke the commitment under D.C.Code § 16–2324 because (1) YSA had made fraudulent representations to the court about K.D.'s placement and (2) newly discovered information about K.D.'s treatment showed that placement at a residential facility was no longer necessary.[6] After hearing further from K.D.'s counsel, the court denied the District's request and modified the December 1 order so that K.D. could be placed at Oak Hill pending a new disposition, which was rescheduled for December 15.

At the second disposition hearing on December 15, 2003, the District asked that K.D. "be recommitted to YSA for residential placement" at Riverside.[7] The court heard testimony from Dr. Pamela Blake, who discussed K.D.'s neurological evaluation and stated that Oak Mountain's treatment program would be better for K.D. The court also heard from Vanessa Portier, the Director of Social Services at Riverside, who described Riverside's facilities and treatment program. At the conclusion of the hearing, the court denied the District's request and placed K.D. on probation at Oak Mountain for a period of one year, which was "stayed until representatives from Oak Mountain residential facility [were] ready to pick up [K.D.] from the Oak Hill Youth Center." The court stated that the costs for the placement at Oak Mountain would be paid by Medicaid.

### B. *L.C.'s Case*

On August 29, 2003, L.C. was committed to the custody of DHS until the age of twenty-one.[8] The commitment was restrictive,[9] and the trial court recommended that DHS keep L.C. at Oak Hill Youth Center pending placement in a residential facility. L.C.'s counsel had requested that L.C. be placed at Riverside, but the court said it did not have the authority to direct placement:

> He's committed to YSA. If you can talk to them, you know I don't have authority; I can recommend things to YSA. If you want to call them up, call the intake people and say . . . I represent L.C., he's coming your way, this is the recommendation, consider this until residential is an option, fine with me.

> But that's between you and YSA. I'm out of the picture now.

Then, at a subsequent review hearing on November 21, 2003, L.C.'s counsel asked the court to place L.C. on probation. Because L.C. was still at Oak Hill awaiting placement, the court decided instead to place L.C. in a group home:

> This commitment is—well, let me put it this way. I am ordering that he be released from Oak Hill. I'm not vacating the commitment. And if you want to challenge me, challenge me. . . .

> I am modifying the commitment to recommend that he be placed in a group home.

---

6. D.C.Code § 16–2324 (2001) states that an order of the court in a delinquency or neglect proceeding "shall be set aside if—(1) it was obtained by fraud or mistake sufficient to set aside an order or judgment in a civil action; (2) the Division lacked jurisdiction; or (3) newly discovered evidence so requires."

7. Alternatively, the District requested that the matter "be continued and that YSA be given

an opportunity to explore further options. . . ."

8. On March 26, 2003, L.C. had been found guilty of carrying a pistol without a license and possession of an unregistered firearm.

9. As in K.D.'s case, the court's order stated that L.C. could be released into aftercare "only by order of the [court]."

The District objected and asked the court not to modify the order, but the court replied that, "depending on how [L.C.] does from the next fifteen to thirty days, we'll decide whether or not this commitment will continue."

On December 15, 2003, a follow-up hearing was held to discuss L.C.'s status. During that hearing, the court expressed concern over the fact that L.C. had been at Oak Hill for four months awaiting a placement.[10] Counsel for the District responded that YSA was attempting to place L.C. and that "it takes time for the providers to get these assessments done." The court then stated that its options were either "to let [L.C.] sit there [at Oak Hill] getting worse or throw him out in the community and the same place he was when he came in." L.C.'s counsel stated that under *In re A.A.I.*, 483 A.2d 1205 (D.C.1984), "the court does have the authority to vacate or to change a placement where . . . [DHS is] not carrying out [its] responsibility, [and the court] certainly can do that post-*In re P.S.*"[11] As additional support, counsel relied on D.C.Code § 16–2324, stating that "there is no way that . . . the court could have anticipated or predicted that the agency entrusted with [L.C.] would have . . . handled the situation in the way that it did in terms of it being quasi or newly discovered evidence." The District, however, maintained that the court did not have the authority to alter the commitment.

After hearing from both sides, the court decided to vacate the commitment and placed L.C. on probation for a period of one year,[12] saying:

[L.C. is] not getting one ounce of care and rehabilitation, which is the whole purpose of this commitment. So if the purpose of the commitment is not being satisfied, why continue the commitment? . . .

Section 16–2322(f) says that unless sooner terminated all orders of the division under this subchapter in force with respect to a child terminate when he reaches twenty-one years of age, unless sooner terminated. That means that somebody has the authority to soon . . . terminate.

To interpret [*In re P.S.*] to mean that a court cannot terminate its own orders would give full, complete, total, and absolute control over these disposition orders that we sign to an agency that has proven itself for years incapable of doing its work.

### C. *K.A.'s Case*

On April 13, 2000, K.A. was committed to the custody of DHS until the age of twenty-one.[13] The commitment again was restrictive,[14] and the court directed DHS

---

10. It is not entirely clear from the record, but it appears that L.C. was never placed in a group home as the trial court had ordered.

11. At the end of the hearing, the court said: I'm not sure whether *In re A.A.I.* is applicable. I guess at that time the statutory scheme was different. The law did not include the amendments that form the basis of the Court of Appeals opinion in [*In re P.S.*]. When *In re A.A.I.* was decided, judges sitting in what was then the Family Division were empowered to designate a particular placement. . . . The people upstairs will decide to what extent *In re A.A.I.* carries any weight in resolving this issue.

"The people upstairs" apparently is a reference to this court.

12. The conditions of L.C.'s probation included educational placement, weekly drug testing, drug education, an 8:00 p.m. curfew, and individual therapy.

13. On December 21, 1999, K.A. had pleaded guilty to receiving stolen property.

14. As in the other two cases, the court's order stated that K.A. could be released into aftercare "only by order of the [court]."

to place K.A. in a group home.[15] On November 21, 2003, a review hearing was held to address K.A.'s status and an outstanding custody order. The hearing was conducted in two parts. During the first part, at which K.A. was not present, K.A.'s counsel explained that K.A. was "soon to be nineteen, and our request would be that the court close the case ...." The court responded:

> Okay. At this point, the restriction is lifted. I don't have any authority to close the case itself to the agency, but they may do [so]. If they wish to do so, they can. That's based on the language in [D.C.Code § ] 16–2322(a)(4), which [says], once the Court does not continue [to] assert for itself the right to close the case, it's up to the agency to release the child when it determines that the purpose of the disposition order has been achieved.[16]

> So you might want to lobby the folks at YSA to have this matter closed ....

The court took a different approach when K.A. arrived for the second part of the hearing, in which his counsel renewed the request to close the case. K.A.'s counsel, government counsel, and the court then had a discussion about whether the court had authority to terminate the commitment under D.C.Code §§ 16–2322(a)(4) and (f) and our decision in *In re P.S.* Counsel for the District asserted that "the court lacks jurisdiction at this point to terminate the case." Despite its earlier statement that it lacked the authority to close the case, the court decided that "[t]he case will be closed." [17]

The District filed a notice of appeal and, two days later, filed a motion for reconsideration and/or a stay pending appeal. On December 8, 2003, the trial court denied the District's motion, concluding that "the District is not likely to prevail on appeal." The court explained in its order that, under the District of Columbia Code and the Superior Court's Juvenile Rules, it was authorized to close K.A.'s case because K.A. was no longer in need of rehabilitation:

> ... This Court had authority to terminate [K.A.'s] commitment pursuant to D.C.Code § 16–2322(a)(4) and (f) and Super. Ct. Juv. R. 32(f)(4).[18] The Court was additionally authorized to vacate its April 2000 commitment order, as it was inconsistent with the mandates of *In re P.S.*, 821 A.2d 905 (2003), and then dismiss [K.A.'s] case pursuant to Superior

---

15. The court also ordered that K.A. receive individual therapy, weekly drug testing, drug education, and weekly home visits at the discretion of the group home staff.

16. D.C.Code § 16–2322(a)(4) (2001) states:

> Subject to subsection (f) of this section, a dispositional order vesting legal custody of a child adjudicated delinquent or in need of supervision in a department, agency, or institution shall remain in force for an indeterminate period not to exceed the youth's twenty-first birthday. Unless the order sets a minimum period for commitment of the child, or specifies that release is permitted only by order of the Division, the department, agency, or institution may release the child at any time that it appears the purpose of the disposition order has been achieved.

17. We view the court's decision to "close" the case as a decision to release K.A. from the custody of DHS, because the court did not order probation or any further treatment or placement after closing the case.

18. The court apparently was alluding to the following language from Super. Ct. Juv. R. 32(f)(4):

> Upon the automatic termination of any dispositional order, *or in cases where the Division terminates a dispositional order prior to the stated termination date thereof,* written notice of termination shall be furnished to [various persons].
> [Emphasis added.]

Court Rule of Juvenile Procedure 48(b),[19] as he is no longer in need of care and rehabilitation.

The Court determined at the November 21, 2003, hearing that [K.A.] was no longer in need of the care or rehabilitation provided by the [YSA]. The Court therefore concludes that [K.A.] will not suffer any harm, let alone irreparable harm by the continued termination of his commitment.

The District filed timely notices of appeal from several of the orders to which it had objected, and on December 17, 2003, this court consolidated all of the appeals in all three cases.

## II

As we said earlier, the two issues raised by these consolidated appeals are (1) whether the trial court can direct placement or order probation as a means of directing treatment after committing a delinquent juvenile to the custody of a public agency, and (2) whether the trial court can release a delinquent juvenile after that juvenile has been committed to the custody of a public agency. To decide these questions, we must analyze the trial court's construction of the relevant statutes, which we review *de novo*. *See, e.g., Carter v. State Farm Mutual Automobile Insurance Co.*, 808 A.2d 466, 470 (D.C.2002); *Ashton General Partnership v. Federal Data Corp.*, 682 A.2d 629, 632 (D.C.1996). Before delving into a discussion of the issues, we point out that we do not distinguish—as the parties sometimes do—among orders vacating, modifying, and terminating commitment.[20] Instead, we focus on what the trial court intended to do in each of the three cases before us: (1) directing placement and then ordering probation as a way to direct treatment in the cases of K.D. and L.C., and (2) closing K.A.'s delinquency case.

## III

With respect to the first issue, the District asserts that D.C.Code § 16–2322(a)(4) and our decision in *In re P.S.* establish that the trial court no longer has the power it formerly had to direct placement or treatment once a delinquent juvenile has been committed to the custody of DHS.[21] Although we agree with the District that the trial court lacks such power, we rely not on section 16–2322(a)(4), but on D.C.Code § 16–2320(c)(1) (1993 Supp.

19. Super. Ct. Juv. R. 48(b) states in part:

Even though the Division may have acquired jurisdiction, the judicial officer may at any time during or at the conclusion of any hearing dismiss a petition and terminate the proceedings relating to the respondent, if such action is in the interests of justice and the welfare of the respondent. . . .

20. In their joint brief, K.D. and L.C. assert that the trial court "vacated" the orders of commitment, and K.A.'s brief states that the court "terminated" the commitment. The District's brief often uses the terms "vacating," "modifying," and "terminating" interchangeably. While the difference among vacating, modifying, and terminating an order may be important in some contexts, we see no need to make such distinctions in these cases. Therefore, for the purpose of these consolidated appeals, we shall examine what the trial court intended by its actions in each case, and not focus on the terms used by the court or adopted by the parties.

21. In addition, the District maintains that it "never had a chance to respond to the appellees' allegations or requests for relief" during the various commitment review hearings, and that "[t]hese hearings are not meant for a full scale trial concerning the claims that DHS is failing to provide care and rehabilitation." Because the transcripts from the hearings in all three cases show that the trial court did afford the District an opportunity to present its counter-arguments, we reject this contention.

& 2001) and on our interpretation of that section of the Code in *In re P.S.*[22]

■ Prior to 1993, D.C.Code § 16-2320(c)(1) (1989) provided:

> (c) If a child is found to be delinquent or in need of supervision, the [Family] Division may order any of the following dispositions for his supervision, care, and rehabilitation:
>
> (1) Any disposition authorized by subsection (a) (other than paragraph (3)(A) thereof).

In 1993 the Council of the District of Columbia amended section 16-2320(c)(1) by adding a critical provision to it, which we have here italicized:

> (c) If a child is found to be delinquent or in need of supervision, the [Family] Division ... may order any of the following dispositions which will be in the best interest of the child:
>
> (1) Any disposition authorized by subsection (a) of this section (other than paragraphs (3)(A) *and (5)* thereof).

D.C.Code § 16-2320(c)(1) (1997).[23] This change was significant because—as we held in *In re P.S.*—with this amendment the Council removed from the trial court its power to direct placement and treatment under section 16-2320(a)(5) (1989) in delinquency cases.[24] *See In re P.S.*, 821

A.2d at 908 ("in exercising its dispositional authority in delinquency cases, the court must act pursuant to 'specifically granted authority' ")(quoting *In re J.M.W.*, 411 A.2d 345, 348 (D.C.1980)). Therefore, given the plain meaning of the 1993 amendment to subsection (c)(1), we hold that since its enactment in 1993 the trial court no longer has the power to direct placement or order probation as a means of directing treatment after a juvenile has been committed to a public agency. *See, e.g., Peoples Drug Stores, Inc. v. District of Columbia*, 470 A.2d 751, 753 (D.C.1983) ("The primary and general rule of statutory construction is that the intent of the lawmaker is to be found in the language that he has used" (citation omitted)).

We note in addition that the legislative history of the 1993 amendment also supports our interpretation. *See, e.g., District of Columbia v. Cato Institute*, 829 A.2d 237, 240 (D.C.2003) ("in certain circumstances it is appropriate to look beyond even the plain and unambiguous language of a statute to understand the legislative intent"). The Council's Report on the 1993 amendment began by stating that "the legislation will give the Mayor greater authority and control over the placement, rehabilitation, and the length of time the juvenile offender (delinquents and persons

---

**22.** Although the District correctly relies on *In re P.S.* in its briefs, it fails to recognize that our holding in *In re P.S.* regarding the trial court's ability to direct placement or treatment was primarily based on the 1993 amendment to section 16-2320(c)(1), not section 16-2322(a)(4). As our discussion of K.A.'s case in part IV of this opinion will show, section 16-2322(a)(4) deals with the trial court's ability to release a delinquent juvenile.

**23.** Subsection (c)(1) has not been changed since the 1993 amendment and reads the same today. *See* D.C.Code § 16-2320(c)(1) (2001).

**24.** D.C.Code § 16-2320(a)(5) (2001), which addresses the scope of the trial court's power in neglect cases, states in pertinent part:

> The Division may make such other disposition as is not prohibited by law and as the Division deems to be in the best interests of the child. The Division shall have the authority to ... order any public agency of the District of Columbia to provide any service the Division determines is needed and which is within such agency's legal authority ....

The language in this subsection has not been changed since the 1993 amendment to section 16-2320(c)(1).

in need of supervision) remains under the control of the juvenile system." COUNCIL OF THE DISTRICT OF COLUMBIA, COMMITTEE ON THE JUDICIARY, REPORT ON BILL 9–374, The "Criminal and Juvenile Justice Reform Act of 1992" (November 5, 1992) (hereafter "Council Report"), at 2. The report then addressed the amendment to section 16–2320(c)(1):

> Subsection (a)
>
> Under current law, if a child is found to be delinquent or in need of supervision, the Division can order an array of dispositions .... *This bill amends current law by eliminating the "catch all" provision which afforded the court more discretion in placing juveniles adjudicated to be delinquent or in need of supervision ....*
>
> \*  \*  \*  \*  \*  \*
>
> Subsection (c)
>
> In the case of a child adjudicated delinquent or in need of supervision who has been transferred to the legal custody of the Mayor ... *the Mayor has the sole authority to determine the conditions and location of the child's placement at the time of commitment and shall make such placement in accordance with the best interest of the child and the protection of public interest.*

Council Report at 4 (emphasis added). Even if the plain meaning of the 1993 amendment to section 16–2320(c)(1) were not as clear as it is, this language from the Council Report would require us to conclude that the trial court no longer has the power to direct placement or treatment after a delinquent juvenile has been committed to a public agency.

In *In re P.S.*, which was the first case before this court involving the 1993 amendment to section 16–2320(c)(1), we explicitly recognized the statutory change that the Council intended and achieved. *See* 821 A.2d at 909. We held in *In re P.S.* that "in juvenile delinquency proceedings, as distinct from abuse and neglect cases, the court no longer has the statutory authority to direct the placement or future treatment of juveniles who have been committed to a public agency, such as DHS." *Id.* at 907. The trial court in *In re P.S.* had initially committed the juvenile to DHS. Then, in a supplemental order, the court directed DHS to place the juvenile in a particular treatment facility, to obtain the court's permission before transferring him to another facility, and to provide specific treatment.

The District argued that "the trial court exceeded its statutory authority when it issued a supplemental order ...." *Id.* at 907.[25] We analyzed the District's argument by first explaining the interaction between subsections (a) and (c) of section 16–2320:

> ... Subsection (a) of this statute describes the extent of the trial court's authority in neglect cases, while subsection (c) describes that authority in delinquency cases. Subsection (c) permits Family Court judges handling delinquency matters to exercise most of the options available in subsection (a).... Although the authority to make certain dispositions is similar in delinquency and neglect cases, a judge in a neglect proceeding has broader authority than a judge in a delinquency proceeding because § 16–2320(a)(5) permits a judge in a neglect case to "make such other dispositions ... as the [court] deems to be in the best interest of the child [and to] order any public agency of the District

---

**25.** We concluded that the court's issuance of a supplemental order was equivalent to making a decision regarding treatment and placement after commitment. *See In re P.S.*, 821 A.2d at 911 n. 11.

of Columbia to provide any service the [court] determines is needed." *There is no analogous provision applicable to delinquency cases.*

*Id.* at 908–909 (emphasis added). We then spoke directly about the effects of the 1993 amendment to section 16–2320(c)(1):

> ... When the legislature amended § 16–2320 in 1993, § 16–2320(a)(5), which previously applied to judges in both neglect and delinquency cases, became applicable only to judges in neglect cases. By limiting § 16–2320(a)(5) to neglect cases, the legislature did two things: (1) it removed the broad authority of the court to make dispositions that are not *specifically listed* in the statute, and (2) it specifically removed the court's authority to order a public agency to provide specific services in juvenile delinquency cases.

*Id.* at 909 (emphasis in original).

As our discussion of the statute in *In re P.S.* shows, the 1993 amendment took away from the trial court all authority to direct placement and order probation as a means of directing treatment after a juvenile has been committed to the custody of a public agency such as DHS. It follows—and we hold—that the court committed error in purporting to do so in the cases of K.D. and L.C. While we are "sympathetic" to the trial court's concern for K.D. and L.C., "the court cannot simply usurp DHS's administrative authority, even if it is motivated solely by concern for [the child's] welfare." *In re J.J.*, 431 A.2d 587, 593 (D.C.1981) (footnote omitted).[26]

We make two additional observations concerning the cases of K.D. and L.C. First, we point out (as the trial court recognized in L.C.'s case) that the justification for our 1984 holding in *In re A.A.I.* no longer exists in light of the change made to section 16–2320(c)(1) in 1993. In *In re A.A.I.* we held that "[o]nly when the disposition order is issued *and* is implemented by DHS does the [trial court] relinquish its authority to make a new disposition, and DHS can assume exclusive supervisory responsibility over the juvenile." 483 A.2d at 1208 (emphasis in original). We relied on D.C.Code § 16–2320(a)(5) and (c)(1) (1981) as support for our holding. The District argues in the present cases that our decision in *In re A.A.I.* "is not applicable to the current statute because it predates the 1993 amendment that eliminated juvenile judges' authority to make placement and treatment decisions ...." We agree. As we said in *In re P.S.*, "our decisions prior to 1993 that recognized that the trial court in delinquency matters could exercise such broad authority pursuant to § 16–2320(a)(5) are no longer applicable ...." 821 A.2d at 909 (footnote omitted).

■■■■ Second, we are not persuaded by K.D.'s and L.C.'s argument that the trial court "could properly vacate its commitments after making the essentially undisputed findings that DHS had failed to provide care and rehabilitation to the children." They rely on D.C.Code § 16–2324(3) (2001), which states that a trial court's order "shall be set aside if ... newly discovered evidence so requires."[27]

---

**26.** In *In re P.S.*, we noted that the trial court could "direct and supervise a juvenile's treatment regimen" by *initially* ordering probation under D.C.Code § 16–2320(c)(3). "If a child is placed on probation, the court may ensure through its probationary authority that the child receives the treatment the court deems is necessary." 821 A.2d at 912 n. 12. What

the court cannot do is to use probation as a mechanism for directing placement or treatment *after commitment has occurred.*

**27.** K.D. and L.C. also assert in their joint brief that this court "recognized in *In re A.A.I.* ... that D.C.Code § 16–2324 could be a basis for setting aside a disposition ... [when] a court

Although section 16–2324 does not contain a definition of "newly discovered evidence," it is well established that in any case newly discovered evidence generally "must have been in existence at the time of trial." *United States v. Lafayette*, 299 U.S.App.D.C. 288, 291, 983 F.2d 1102, 1105 (1993); *accord, e.g.,* 11 C. WRIGHT, A. MILLER, & M. KANE, FEDERAL PRACTICE AND PROCEDURE § 2859, at 302 (2d ed.1995). Here, however, the newly discovered evidence to which K.D. and L.C. refer is DHS's failure to provide care and rehabilitation. That "evidence" did not come into existence until after the original commitments occurred. Therefore, any failure on DHS's part to provide care or rehabilitation cannot be regarded as newly discovered evidence.[28]

## IV

K.A.'s case is somewhat different from the other two. It requires us to decide whether the trial court has authority to release a delinquent juvenile who has previously been committed to the custody of a public agency. The effect of the court's decision to close K.A.'s case was to release K.A. from DHS's custody. We conclude that the trial court did not have the authority to do that. In delinquency cases, the only power that the trial court retains after a commitment—and even then, only if it is reserved in the commitment order—is a veto power over DHS's decision to release the delinquent juvenile. *See In re P.S.,* 821 A.2d at 911 (interpreting D.C.Code § 16–2322(a)(4)). We reach this conclusion by examining D.C.Code § 16–2322(f), the Council's repeal of subsections (b) through (d) of D.C.Code § 16–2324, and our discussion in *In re P.S.* of the trial court's veto power under section 16–2322(a)(4).

K.A. argues that D.C.Code § 16–2322(a)(4) and (f) grant the trial court the authority to terminate a juvenile's commitment to DHS.[29] He relies primarily on the "unless sooner terminated" language in subsection (f),[30] contending that it implies

learned DHS had contravened a specific finding regarding the child's best interests." This is a misreading of *A.A.I.* We cited section 16–2324 only once in that case, at the end of our opinion, where we stated that "the court must be empowered to act and/or issue an alternative commitment order when DHS fails to comply with the original order of the Division." 483 A.2d at 1209. In any event, as we have stated in the text above, our holding in *In re A.A.I.* is no longer applicable in light of the 1993 Amendment to section 16–2320(c)(1).

28. K.D. and L.C. also maintain that because the civil standard referred to in D.C.Code § 16–2324(1) was not included in D.C.Code § 16–2324(3), see note 6, *supra,* the legislature intended to set a low threshold for overturning a disposition order based on newly discovered evidence. We need not address this argument because, as we have already stated, DHS's post-commitment treatment of K.D. and L.C. is not newly discovered evidence. Moreover, K.D. and L.C. mistakenly rely on *In re D.W.G.,* 115 Daily Wash. L. Rptr. 2097 (D.C.Super.Ct. October 5, 1987) & 115 Daily Wash. L. Rptr. 2109 (D.C.Super.Ct. October 6, 1987), a Superior Court case which held that the trial court has broad discretion to vacate orders based on newly discovered evidence. *In re D.W.G.* is not binding on this court, *see Lewis v. Hotel & Restaurant Employees Union,* 727 A.2d 297, 302 (D.C.1999), and in any event it was decided before the amendment to section 16–2320(c)(1) and the repeal of subsections (b) through (d) of section 16–2324.

29. As additional support, K.A. cites Super. Ct. Juv. R. 32(f)(4) and 48(b), on which the trial court relied as authority for terminating the case. We are not persuaded by K.A.'s reliance on these two rules; moreover, we have previously held that a Superior Court rule "may not override the statute." *Sanker v. United States,* 374 A.2d 304, 310 (D.C.1977).

30. Section 16–2322(f) states: "Unless sooner terminated, all orders of the Division under this subchapter in force with respect to a

that the trial court can terminate a commitment to DHS at any time before its expiration date. According to K.A., "a commitment may end by either of these route[s]—the first if the Family Court terminates its commitment order and the second if the agency releases the child from the commitment." For two reasons, we conclude that K.A. is reading into that phrase ("unless sooner terminated") a grant of power that simply does not exist in delinquency cases in which the juvenile has been committed to a public agency. First, the Council's repeal of D.C.Code § 16–2324(b) through (d) took away from the trial court its authority to terminate or modify a commitment. Second, in *In re P.S.* we interpreted section 16–2322(a)(4) to mean that the trial court retains only a veto power over DHS's decision to release the delinquent juvenile. 821 A.2d at 911.

The District argues that the Council's repeal of subsections (b) through (d) in 1993 shows that the trial court does not have the power to terminate a delinquency case. We agree. Before 1993, D.C.Code § 16–2324 stated:

(a) An order of the Division under this subchapter shall be set aside if—

(1) it was obtained by fraud or mistake sufficient to set aside an order or judgment in a civil action;

(2) the Division lacked jurisdiction; or

(3) newly discovered evidence so requires.

(b) A child who has been committed under this subchapter to the custody of

an ... agency ... may file a motion for modification or termination of the order of commitment on the ground that the child no longer is in need of commitment, if the child ... has applied to the ... agency for release and the application was denied or not acted upon within a reasonable time.

(c) The Director of Social Services shall conduct a preliminary review of motions filed under subsection (b) and shall prepare a report to the Division on the allegations contained therein. The Division may dismiss the motion if it concludes from the report that it is without substance. Otherwise, the Division, after notice, shall hear and determine the issues raised by the motion and deny the motion, or enter an appropriate order modifying or terminating the order of commitment, if it finds such action necessary to safeguard the welfare of the child or the interest of the public.

(d) A motion may be filed under subsection (b) only once every six months.

D.C.Code § 16–2324 (1989). When the Council amended section 16–2320(c)(1) in 1993, it also repealed subsections (b) through (d) of section 16–2324, which were the subsections that gave the trial court the authority to terminate or modify a commitment. The Council retained only subsection (a) of section 16–2324.[31] In its committee report, the Council stated that the repeal of subsections (b) through (d) "in effect removes the appeals process for motions to terminate or modify disposition orders." Council Report at 5. By thus

child terminate when he reaches twenty-one years of age."

**31.** As to the portion of D.C.Code § 16–2324 that the Council retained, K.A. asserts that "[b]ecause the ... Court's April 13, 2000 [commitment] order was entered based on the court's mistaken pre-*In re P.S.* understanding of its authority, it may be vacated under D.C.Code Section 16–2324(1) due to mistake

of law." We disagree. Instead of taking a course that would lead to K.A.'s release, the trial court should have conformed its commitment order to our holding in *In re P.S.*, in which we remanded the case so that the trial court could "revise the order in a manner consistent with [our] opinion." 821 A.2d at 912.

removing a delinquent juvenile's ability to appeal to the trial court for termination or modification, the Council necessarily eliminated as well the trial court's ability to terminate or modify a commitment. And if the trial court can no longer terminate or modify a commitment, it surely cannot close a delinquency case on the basis of the "unless sooner terminated" language found in section 16–2322(f). *See, e.g., Gondelman v. District of Columbia Dep't of Consumer & Regulatory Affairs,* 789 A.2d 1238, 1245 (D.C.2002) ("statutory meaning is ... to be derived, not from the reading of a single sentence or section, but from consideration of an entire enactment against the backdrop of its policies and objectives" (citation omitted)).

Our second reason for concluding that section 16–2322(f) does not grant the trial court the power to close a delinquency case (or to release a delinquent juvenile from DHS's custody) is that we have previously interpreted section 16–2322(a)(4) to mean that the trial court can only veto DHS's decision to release the juvenile; the court itself cannot order such a release. *See In re P.S.,* 821 A.2d at 911. Although we did not address "termination" under section 16–2322(f) in *In re P.S.,* we did address "release" under section 16–2322(a)(4). That provision states:

> Subject to subsection (f) of this section, a dispositional order vesting legal custody of a child adjudicated delinquent or in need of supervision in a department, agency, or institution shall remain in force for an indeterminate period not to exceed the youth's twenty-first birthday. Unless the order sets a minimum period for commitment of the child, or specifies that release is permitted only by order of the Division, the depart-

ment, agency, or institution may release the child at any time that it appears the purpose of the disposition order has been achieved.

We explained that section 16–2322(a)(4) "gives the trial court the authority to decide whether a [delinquent] juvenile ... may be released from the custody of a public agency, such as DHS, *if the court retains this authority in the commitment order.*" *Id.* at 911 (footnote omitted and emphasis added). However, we further emphasized that "Family Court judges handling delinquency matters *may only retain veto power over a decision made by DHS to release the juvenile back to the community.*" [32] *Id.* at 911–912 (emphasis added). Thus two conditions must be met before the trial court can exercise its veto power in delinquency cases: (1) the court must reserve its veto power when ordering commitment and (2) DHS must first decide to release the juvenile. *Id.* These conditions were not met in K.A.'s case.

The trial court initially ordered a restrictive commitment, stating that DHS could release K.A. into aftercare "only by order of the [court]." However, in the first part of the hearing in which the court closed K.A.'s case, the court specifically stated that "the restriction is lifted. I don't have the authority to close the case itself to the agency, but they may do [so]." Then, after returning from a recess, the court announced that it would close K.A.'s case. For two reasons we hold that, by doing this, the court exceeded the scope of its authority under section 16–2322(a)(4). First, by lifting the aftercare restriction, the trial court relinquished whatever veto power it might have had over DHS's deci-

**32.** In making this statement, we were responding to the juvenile's assertion that section 16–2322(a)(4) gave the trial court the power to direct placement and treatment of delinquent juveniles. *See In re P.S.,* 821 A.2d at 910.

sion to release K.A.[33] This meant, as the court recognized, that the decision to release K.A. rested solely with DHS. Second, even if the court still retained any residual veto power over the case, that power would not have allowed *the court* to release K.A. *See In re P.S.*, 821 A.2d at 911. The trial court is required in any case to await DHS's decision to release the juvenile before exercising its veto power. Because DHS made no such decision in K.A.'s case, the court was powerless to act.

## V

We reverse the orders of the trial court which placed K.D. and L.C. on probation. We remand their cases to the trial court with directions to recommit K.D. and L.C. to the custody of DHS. As for K.A., we reverse the trial court's decision to close his case and remand it to the trial court with directions to reopen it and to recommit K.A. to the custody of DHS. We hold that in all three cases the trial court is bound by our decision in *In re P.S.*

*Reversed and remanded.*

---

**33.** The language in the court's original commitment order that K.A. could be released into aftercare "only by order of the [court]" does not, on its face, appear to reserve any power to terminate the commitment. We need not decide whether it might arguably be so construed, because the second necessary event required by *In re P.S.*—a decision *by DHS* to release K.A.—never occurred.