J-S65031-14

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| IN THE INTEREST OF: R.M., A MINOR | IN THE SUPERIOR COURT OF PENNSYLVANIA |
|---|---|
| APPEAL OF: R.M., A MINOR | |
| | No. 666 EDA 2014 |

Appeal from the Dispositional Order December 5, 2013
in the Court of Common Pleas of Monroe County
Juvenile Division at No.: CP-45-JV-0000190-2013

BEFORE: PANELLA, J., OLSON, J., and PLATT, J.[*]

MEMORANDUM BY PLATT, J.:                    **FILED FEBRUARY 13, 2015**

Appellant, R.M., a minor, appeals from the juvenile court's December 5, 2013 dispositional order, following the adjudication of delinquency dated November 15, 2013 and filed November 21, 2013 for one count of rape, two counts of involuntary deviate sexual intercourse, four counts of aggravated indecent assault, and four counts of indecent assault.[1]  Appellant challenges the weight and sufficiency of the evidence for the adjudication.  We affirm on the basis of the juvenile court's January 28, 2014 opinion.[2]

———————————————

[*] Retired Senior Judge assigned to the Superior Court.

[1] 18 Pa.C.S.A. §§ 3121(a)(1), 3123(a)(1), 3125(a)(1) and (2), and 3126(a)(1) and (2), respectively.

[2] On March 18, 2014, the court entered its Rule 1925(a) opinion in which it incorporated and attached as Appendix A its January 28, 2014 opinion
*(Footnote Continued Next Page)*

In its January 28, 2014 opinion, the juvenile court fully and correctly sets forth the relevant facts and procedural history of this case. (**See** Juvenile Court Opinion, 1/28/14, at 1-5). Therefore, we have no reason to restate them here.

Appellant raises the following issues for our review:

I.   Did the Commonwealth prove beyond a reasonable doubt that [Appellant] committed the delinquent acts of rape, involuntary deviate sexual intercourse, aggravated indecent assault, and indecent assault?

II.   Was the evidence upon which the [juvenile] court adjudicated [Appellant] so tenuous, vague and uncertain that the adjudication shocks the conscience and [Appellant] is entitled to a new trial?

(Appellant's Brief, at 7).

After a thorough review of the record, the briefs of the parties, the applicable law, and the well-reasoned opinion of the juvenile court, we conclude that there is no merit to Appellant's issues. The juvenile court properly disposes of all of the questions presented. (**See** Juvenile Ct. Op., at 5-10) (finding: (1) victim's testimony credible, unwaivering and consistent; (2) Commonwealth witnesses supported victim's testimony of time and location of attack; and (3) Appellant conceded victim's testimony, if believed, sufficient to support adjudication and disposition). Accordingly, we affirm on the basis of the juvenile court's January 28, 2014 opinion.

_(Footnote Continued)_ ―――――――――――――

resolving Appellant's post-dispositional motion. **See** Pa.R.A.P. 1925. Therefore, we will refer to the January 28, 2014 opinion.

Order affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 2/13/2015

COURT OF COMMON PLEAS OF MONROE COUNTY
FORTY-THIRD JUDICIAL DISTRICT
COMMONWEALTH OF PENNSYLVANIA
JUVENILE COURT DIVISION

IN THE INTEREST OF: : NO. 190 JV 2013
:
R.M.J., a minor : APPEAL DOCKET No. 666 EDA 2014
:
:
:

## OPINION IN SUPPORT OF ORDER PURSUANT TO Pa. R.A.P. 1925(a)

The Juvenile has filed an appeal to the Superior Court from the Order of

Disposition entered December 5, 2013, following his adjudication of delinquency for

Rape, two counts of Involuntary Deviate Sexual Intercourse, and four counts each of

Aggravated Indecent Assault and Indecent Assault.[1]  After the appeal was filed, we

directed the Juvenile to file a Statement of Errors Complained of on Appeal pursuant

to Pa. R.A.P. 1925(b).   The Juvenile complied.   His statement raises only two

general, conclusory, boilerplate assignments of error:

> a.   The evidence was insufficient to sustain the juvenile's
> adjudication for Rape, Involuntary deviate Sexual Intercourse,
> Aggravated Indecent Assault, and Indecent Assault.
>
> b.  The finding of delinquency is against the weight of the evidence
> presented.

(Juvenile's Appeal Statement, Paragraph 7).  We now issue this Opinion pursuant to

Pa. R.A.P. 1925(a).

---

[1] The Commonwealth has also filed an appeal.  However, because the Commonwealth is challenging our determination that the registration and reporting requirements of Megan's Law IV, 42 Pa. C.S.A. Section 9799.10 et. seq., are unconstitutional as applied to the Juvenile, its appeal was filed directly to the Supreme Court of Pennsylvania pursuant to 42 Pa. C.S.A. Section 722 (7). On March 11, 2014, the Supreme Court issued an Order noting probable jurisdiction.



Initially, we do not believe that the Juvenile's boilerplate assignments of error are sufficient to preserve issues for appellate review. In this regard, the Juvenile does not even attempt to explain how the adjudication was against the weight or the sufficiency of the evidence. Thus, we believe he has waived his claims.

In the alternative, if the Juvenile's assertions will be reviewed on appeal, they are completely without merit for the reasons stated in the Memorandum Opinion we filed on January 28, 2014. A copy of the Memorandum Opinion is attached as Appendix A and incorporated into this Opinion by reference. The weight and sufficiency challenges cursorily raised by the Juvenile are adequately, properly, and fully addressed in that Opinion.

For the reasons stated in the Memorandum, the Order of Disposition should be affirmed.

BY THE COURT:

DATE: 3/17/2014

JONATHAN MARK, J.

cc:    Superior Court of Pennsylvania
       Jonathan Mark, J
       District Attorney (MB)
       Public Defender (SA)
       Juvenile Probation

2014 MAR 18 AM 10 59
MONROE COUNTY, PA
CLERK OF COURTS

2

COURT OF COMMON PLEAS OF MONROE COUNTY
FORTY-THIRD JUDICIAL DISTRICT
COMMONWEALTH OF PENNSYLVANIA
JUVENILE COURT DIVISION

IN THE INTEREST OF:              : NO. 190 JV 2013

RICKY MARTINEZ-JOYCE, a minor   : APPEAL DOCKET No. 666 EDA 2014

# APPENDIX A

## To

## Opinion In Support of Order Pursuant to Pa. R.A.P. 1925(a)

COURT OF COMMON PLEAS OF MONROE COUNTY
FORTY-THIRD JUDICIAL DISTRICT
COMMONWEALTH OF PENNSYLVANIA
JUVENILE COURT DIVISION

IN THE INTEREST OF: : NO. 190 JV 2013

R&#x2588;&#x2588; M&#x2588;&#x2588;&#x2588;&#x2588;&#x2588;&#x2588;&#x2588;&#x2588;, a minor :

:

:

:

## MEMORANDUM

On January 15, 2014, we entered an order granting in part and denying in part the Juvenile's post disposition motion. We denied the Juvenile's challenges to the weight and sufficiency of the evidence, but granted his constitutional challenge to the provisions of Megan's Law IV, 42 Pa. C.S.A. Section 9799.10 *et. seq.*, that required him to register as a Juvenile Offender for life based solely on his adjudication of delinquency for specified sex offenses. Our order indicated that a statement of reasons or an opinion would follow. We now issue this Memorandum.

## Background

On November 6, 2013, the juvenile was arrested, detained, and charged with felony and misdemeanor sex offenses. A delinquency petition alleging that the Juvenile had committed Rape, Involuntary Deviate Sexual Intercourse, Aggravated Indecent Assault and Indecent Assault was subsequently filed.[1]

---

[1] The Juvenile was charged with one count of Rape, 18 Pa.C.S. § 3123(a)(1), two counts of Involuntary Deviate Sexual Intercourse, 18 Pa.C.S. § 3125(a)(1), two counts of Aggravated Indecent Assault, 18 Pa.C.S. § 3125(a)(1), two counts of Aggravated Indecent Assault, 18 Pa.C.S. § 3125(a)(2), two counts of Indecent Assault, 18 Pa.C.S. § 3126(a)(1) and two counts of Indecent Assault, 18 Pa.C.S. § 3126(a)(2).

1

On November 8, 2013, a detention hearing was held at which the victim testified. At the conclusion of the hearing, we found that the Commonwealth had established probable cause that the Juvenile had committed the delinquent acts listed in the petition and determined that continued detention was warranted.

On November 15, 2013, an adjudication hearing was held at which the victim testified and the Commonwealth called two additional witnesses. The Juvenile did not present evidence. Instead, through his attorney, he argued that the victim was not credible.

After hearing the evidence and arguments of counsel, we found that the Commonwealth had established beyond a reasonable doubt the elements of the offenses with which the Juvenile had been charged. In doing so, we clearly stated that we found the testimony of the victim and the other Commonwealth witnesses to be credible. (N.T., November 15, 2013, pp. 65-66). Accordingly, we adjudicated the Juvenile delinquent of all eleven charges filed in the delinquency petition.

On December 5, 2013, following a disposition hearing, we ordered that the Juvenile be placed at Abraxas Academy Detention Center. During the course of the hearing, we reiterated our determination that the testimony of the victim was credible and more than enough to sustain the delinquency adjudication. (N.T., 12/5/2013, pp. 18-19). Since the Juvenile had not yet raised his constitutional challenge to the juvenile sex offender registration provisions, we classified the Juvenile as a "Juvenile Offender" and notified him of his duty to comply with the reporting and registration requirements of Megan's Law IV for the rest of his life. (N.T., 12/5/2013, pp. 24-37; Order of Disposition, filed December 5, 2013).

2

At the time, there were pending before this Court constitutional challenges to Megan's Law IV filed by five other juveniles, each of whom, like the Juvenile in this case, had been classified as a Juvenile Offender and directed to register for life based on a delinquency adjudication for a specified sexual offense. The cases in which the challenges had been raised were consolidated for hearing and decision. For ease of reference, we will hereafter refer to those cases as the "consolidated cases." The same attorney who represents the five juveniles in the consolidated cases represents the Juvenile in this case. Counsel was given several opportunities to assert a challenge on behalf of the Juvenile in this case. At one point counsel asked us to hold off designating the Juvenile as a Juvenile Offender until a decision had been made in the consolidated cases. However, we declined to do so in the absence of a challenge being filed in this case. Since no challenge was filed before disposition, the Juvenile was classified as a Juvenile Offender.

On December 16, 2013, the Juvenile filed the instant post disposition motion. As indicated, the Juvenile alleged that there was insufficient evidence to sustain the delinquency adjudication and that the adjudication was against the weight of the evidence. He also raised his constitutional challenge to Megan's Law IV.

A hearing on the motion was held on January 13, 2014. During the hearing, counsel for the Juvenile and the attorney for the Commonwealth argued their respective positions. The Juvenile's attorney submitted a copy of *In re J.B. et. al.*, No. 726 JUV 2010 *et. al.* (C.P. York, filed November 4, 2013) (Uhler, S.J.), an opinion in which the Court of Common Pleas of York County had determined that Megan's law IV is unconstitutional as applied to juvenile offenders. (N.T., 1/13/2014,

3

Juvenile's Exhibit No. 1). The Commonwealth presented copies of several cases that it believed supported its opposition to the Juvenile's challenge. At the end of the hearing, we re-affirmed our credibility determinations and indicated that we would deny the weight and sufficiency claims. We took the constitutional challenge under advisement and informed the parties that we would issue an order, with an opinion to follow, in the next two days in order to meet the 30-day decision period set forth in Pa.R.J.C.P. 620(D)(1). Counsel for both parties were given permission to file of record in this case the briefs they had submitted in the consolidated cases. In addition, the attorneys were granted leave to file supplemental memoranda.

Counsel followed through and filed in this case copies of the briefs that had been submitted in the consolidated cases. The Commonwealth supplemented its oral and written arguments. Counsel for the Juvenile elected to stand on her oral arguments, the brief she had filed in the consolidated cases, and the opinion in *In re J.B. et. al, supra*.

On January 15, 2014, we issued the order that is the subject of this Memorandum. As indicated, we denied the Juvenile's evidence-based challenges, but sustained his challenge to the provisions of Megan's Law IV that required him to register as a Juvenile Offender. As a result, we vacated the portion of order of disposition that required the Juvenile to register as a Juvenile Offender and to comply with the registration and reporting requirements of Megan's Law IV and ordered the Pennsylvania State Police to remove the Juvenile's name, photograph, and other information from the Sexual Offender Registry.

4

On January 16, 2014, President Judge Margherita Patti Worthington issued a comprehensive opinion and order in the consolidated cases finding that Megan's Law IV is unconstitutional as it applies to Juvenile Offenders who are not assessed to be sexually violent delinquent children. Accordingly, like the Juvenile in this case, the juveniles involved in the consolidated cases were all declassified as "Juvenile Offenders" and the Pennsylvania State Police were directed to remove their names, photographs, and other information from the sexual offender registry. *In re BB et. al.*, No. 248 JUV 2012 *et. al.* (C.P. Monroe, filed January 16, 2014) (Worthington, P.J.). A copy of President Judge Worthington's Opinion is attached as Appendix A and incorporated into this opinion by reference.

<u>Challenges to the Weight and Sufficiency of the Evidence</u>

In his motion, the Juvenile asserted standard weight and sufficiency of the evidence challenges. Both are without merit.

In our January 15, 2014 order, we indicated that the evidentiary challenges were being denied for the reasons stated on the record at the conclusion of the November 15, 2013 adjudication hearing (N.T., 11/15/2013, pp. 64-66), during the December 5, 2013 disposition hearing (N.T., 12/5/2013, pp. 18-19), and during the January 13, 2014 hearing on the Juvenile's Post-Disposition Motion. We continue to believe that our on-record statements are sufficient to address these contentions, but write additionally to amplify our reasoning and recite the standards that we used to decide the weight and sufficiency claims.

The standard to be applied when reviewing a challenge to the sufficiency of evidence is well-settled:

5

When a juvenile is charged with an act that would constitute a crime if committed by an adult, the Commonwealth must establish the elements of the crime by proof beyond a reasonable doubt. When considering a challenge to the sufficiency of the evidence following an adjudication of delinquency, we must review the entire record and view the evidence in the light most favorable to the Commonwealth.

In determining whether the Commonwealth presented sufficient evidence to meet its burden of proof, the test to be applied is whether, viewing the evidence in the light most favorable to the Commonwealth, and drawing all reasonable inferences therefrom, there is sufficient evidence to find every element of the crime charged. The Commonwealth may sustain its burden of proving every element of the crime beyond a reasonable doubt by wholly circumstantial evidence.

The facts and circumstances established by the Commonwealth need not be absolutely incompatible with a defendant's innocence. Questions of doubt are for the hearing judge, unless the evidence is so weak that, as a matter of law, no probability of fact can be drawn from the combined circumstances established by the Commonwealth.

*In re R.N.*, 951 A.2d 363, 366-67 (Pa. Super. 2008).

The existence of inconsistencies in the testimony of a witness does not alone render evidence insufficient to support a verdict. *Com. v. Lyons*, 833 A.2d 245, 258 (Pa. Super. 2003), *appeal denied*, 879 A.2d 782 (Pa. 2004). It is the province of the trier of fact to pass upon the credibility of witnesses and the weight to be accorded the evidence produced. *In re T.B.*, 11 A.3d 500, 504 (Pa. Super 2010); *Com. v. A.W.C.*, 951 A.2d 1174 (Pa. Super. 2008). While passing upon the credibility of witnesses, the trier of fact is free to believe all, part, or none of the evidence. *Com. v. Dupre*, 866 A.2d 1089 (Pa. Super. 2005). Finally, the uncorroborated testimony of the complaining witness is alone sufficient to sustain a conviction for a sexual offense. This is true even if contrary evidence is presented by the defense. *Lyons*, 833 A.2d at 258; *Com. v. Bishop*, 742 A.2d 178 (Pa. Super. 1999), *appeal denied*,

6

758 A.2d 1194 (Pa. 2000); *Com. v. Trimble*, 615 A.2d 48, 50 (Pa. Super. 1992); *Com. v. Stoner*, 425 A.2d 1145, 1148 (Pa. Super. 1981); 18 Pa.C.S.A. § 3106.

The standard to be applied in deciding a weight challenge is equally well-settled. A claim that the verdict was against the weight of the evidence is a more narrow inquiry than a sufficiency of the evidence challenge. *Com. v. Price*, 616 A.2d 681, 684 (Pa. Super. 1992). A challenge to the weight of the evidence, in contrast to a challenge to the sufficiency of the evidence, "concedes that there is sufficient evidence to sustain the verdict." *Com. v. Smith*, 853 A.2d 1020, 1027 (Pa. Super. 2004) (citing *Com. v. Bennett*, 827 A.2d 469 (Pa. Super. 2003)). The trial court must determine whether, notwithstanding all the facts, certain facts are clearly of greater weight so that to ignore them or to give them equal weight with all the other facts is to deny justice. *Smith*, 827 A.2d at 1027. A new trial or hearing should not be granted because of a mere conflict in testimony or because a different conclusion may be reached by another fact finder. *See id.* at 1028.

> In an adjudication hearing, the juvenile court judge
>
> sits as the finder-of-fact. ... [W]here the credibility of witnesses is at issue, the weight to be assigned the testimony of the witnesses is within the exclusive province of the fact-finder. The hearing judge, as sole assessor of credibility, may believe all, part or none of the evidence presented. The hearing judge's findings will not be reversed ... unless it appears that he has clearly abused his discretion or committed an error of law.

*In re Love*, 646 A.2d 1233, 1237 (Pa. Super. 1994), *appeal denied*, 655 A.2d 511 (Pa. 1995), *certiorari denied*, *Love v. Pennsylvania*, 515 U.S. 1126 (1995). The duties of a fact-finder include resolving all issues of credibility, resolving conflicts in the evidence, making reasonable inferences from the evidence, and deciding which

witnesses to believe. The weighing process by which a juvenile hearing judge determines witness credibility is within the exclusive province of the judge as fact-finder and is not subject to challenge or review by the disappointed party urging a re-weighing of factors. See *In re Interest of R.N.*, 951 A.2d at 372 n.7 (noting that, in reviewing a weight challenge, the Superior Court "cannot re-weigh the evidence presented to the fact finder" who determines witness credibility and assesses the weight of the evidence presented). *See also Com. v. Garcia*, 535 A.2d 1186, 1188 (Pa. Super. 1988) (credibility determinations are generally not subject to review).

The appellate standard of review on a claim that the verdict or adjudication was against the weight of the evidence

> is very narrow. The determination of whether to grant a new trial because the verdict is against the weight of the evidence rests within the discretion of the trial court, and we will not disturb that decision absent an abuse of discretion. Where issues of credibility and weight of the evidence are concerned, it is not the function of the appellate court to substitute its judgment based on a cold record for that of the trial court. The weight to be accorded conflicting evidence is exclusively for the fact finder, whose findings will not be disturbed on appeal if they are supported by the record. A claim that the evidence presented at trial was contradictory and unable to support the verdict requires the grant of a new trial only
>
> when the verdict is so contrary to the evidence as to shock one's sense of justice.

*Com. v. Lyons, supra* at 259 (quoting *Com. v. Griffin*, 453 Pa. Super. 657, 684 A.2d 589, 596 (1996) (internal citations omitted)).

In this case, the victim unequivocally testified that she was orally and anally raped by the Juvenile without her consent (N.T., 11/15/2013, pp. 10-12, 14.) She just as clearly testified that the Juvenile used his fingers to penetrate her vagina. (*Id.* at

8

12.) As we stated during the adjudication hearing, the disposition hearing, and the hearing on the Juvenile's post-disposition motion, and as we now re-affirm, we believed her. The victim's credible testimony standing alone was by itself enough to establish the elements of the crimes charged and sustain the adjudication.

But the victim's testimony did not stand alone. While the other witnesses called by the Commonwealth did not observe the sexual assault, their testimony supported the victim's testimony regarding time frame and location of the attack, demonstrated that the Juvenile was in the area at the time of the attack, and showed that the Juvenile had opportunity. Even more significantly, the testimony of the other witnesses demonstrated that the victim was consistent in her description of the assault from the day it occurred up through the date of the adjudication hearing.

Simply, there was ample evidence to support the delinquency adjudication.

In the proceedings before this Court, the Juvenile conceded that the victim's testimony, if believed, is sufficient to support the delinquency adjudication. His main argument was and will in all likelihood continue to be that the victim was not credible and we should therefore not have believed her.

There is no doubt that witness credibility was the key factor in the decision. However, the victim was subject to rigorous cross-examination and remained unwaivering and substantively consistent about the salient facts, especially the fact that the juvenile orally and anally raped her without her consent. In fact, as noted, the evidence showed that the victim has been consistent in her version of the sexual assault from the time she first reported it up through the adjudication hearing. This includes consistent recitations of the attack to her friend, her guidance counselor,

9

and the police, as well as to this Court in her testimony during the detention hearing and the adjudication hearing. There was no past relationship, sexual or otherwise, between the Juvenile and the victim. There was no history between them or their families which might be argued to have prompted a false allegation. There was not even a hint as to reason or motive for the victim to lie. For all practical purposes, the Juvenile and the victim were strangers. Moreover, the undersigned heard the testimony, observed the witnesses, and considered all evidence and all arguments presented by both parties before adjudicating the Juvenile delinquent. As this Jurist stated at the conclusion of the adjudication hearing, as reiterated during both the disposition hearing and the hearing on the Juvenile's post-disposition motion, and as again confirmed in this Memorandum, I found the victim (and the other prosecution witnesses) to be credible and no amount of urging by the Juvenile to reconsider or re-weigh credibility factors will change my assessment.

In short, credibility assessments made by the undersigned were properly based on sensory perceptions in the courtroom, the evidence presented, the testimonial demeanor of the victim, the consistency of her story, and other proper factors. They are not subject to review. When all facts are considered, it is clear that the delinquency adjudication is not contrary to the weight of the evidence, the decision does not shock the conscience, and justice has not been denied. Accordingly, the Juvenile's challenge to the weight of the evidence is baseless.

In sum, the adjudication was amply supported by and was not against the weight of the evidence. The Juvenile's weight and sufficiency claims are devoid of merit.

10

## Challenge to Megan's Law IV

In support of the portion of our order that granted the Juvenile's constitutional challenge to Megan's Law IV and directed that he be removed from the registry, we incorporate and adopt the holding and the thorough and cogent rationale of President Judge Worthington in *In re BB et. al., supra* (Appendix A). For the reasons recited in that opinion, we believe that, as applied to the Juvenile, the registration and reporting requirements of Megan's Law IV are unconstitutional.

BY THE COURT:

DATE: 1/28/14

JONATHAN MARK, J.

cc:     Jonathan Mark, J
        District Attorney (MB)
        Public Defender (SA)
        Juvenile Probation

2014 JAN 28 AM 9 33
MONROE COUNTY, PA
CLERK OF COURTS

11

COURT OF COMMON PLEAS OF MONROE COUNTY
FORTY-THIRD JUDICIAL DISTRICT
COMMONWEALTH OF PENNSYLVANIA

| | |
|---|---|
| IN THE INTEREST OF<br><br>B. B.,<br>    A Minor | :   No.   248 JV 2012<br>:<br>:<br>:   PETITION TO AVOID<br>:   MEGAN'S LAW REGISTRY |
| IN THE INTEREST OF<br><br>K. G.,<br>    A Minor | :   No.   184 JV 2011<br>:<br>:<br>:   PETITION TO AVOID<br>:   MEGAN'S LAW REGISTRY |
| IN THE INTEREST OF<br><br>J. M.,<br>    A Minor | :   No.   386 JV 2009<br>:<br>:<br>:   PETITION TO AVOID<br>:   MEGAN'S LAW REGISTRY |
| IN THE INTEREST OF<br><br>N. S.,<br>    A Minor | :   No.   170 JV 2010<br>:<br>:<br>:   PETITION TO AVOID<br>:   MEGAN'S LAW REGISTRY |
| IN THE INTEREST OF<br><br>C. O.,<br>    A Minor | :   No.   14 JV 2011,<br>:      18 JV 2011<br>:<br>:   PETITION TO AVOID<br>:   MEGAN'S LAW REGISTRY |

OPINION

The matter before us is a Petition, filed jointly by the juvenile offenders B.B., K.G., J.M., N.S., and C.O. ("Juveniles" or "Petitioners"), in which they challenge the registration requirements of the most-current version of Megan's Law ("Megan's Law IV").[1] Megan's Law IV is the first statute in Pennsylvania that requires juveniles to register as sexual offenders. Registration is only required if a juvenile, fourteen years or older, is adjudicated delinquent for one of three, enumerated sex offenses or an attempt, solicitation, or conspiracy to commit the same. As applied to them, the Juveniles claim that the statute is retroactive and has a punitive effect (Ex Post Facto Clause), that the statute creates an irrebuttable presumption (Pa. Due Process), that the statute imposes cruel and unusual punishment (8th Amend.), that the statute impairs their fundamental right to reputation (Pa. Const. Art. I, § 1), and that the statute is in conflict with certain provisions of the Juvenile Act (statutory interpretation).[2]

On October 16, 2012, the Honorable Judge Jonathan Mark issued orders determining that K.G., J.M, and C.O. were 'juvenile offenders' for purposes of registration under Megan's Law IV and would be required to comply with the registration requirements. On

---

[1] The current version of Megan's Law may be found at 42 Pa.C.S.A. § 9799.10 et. seq. Megan's Law IV was created by Act 111 of 2011, which substantially rewrote the Registration of Sexual Offenders Law and amended various provisions of the Crimes Code, the Judicial Code, the Juvenile Act, and the Sentencing Code. Act 111 was adopted on December 20, 2011 and later amended by Act 91 of 2012. Megan's Law IV became effective on December 20, 2012.

For Act 111 of 2011, a legislative history is available online at:
http://www.legis.state.pa.us/cfdocs/billInfo/bill_history.cfm?syear=2011&sind=0&body=S&type=B&bn=1183 (last accessed January 15, 2014).

For Act 91 of 2012, a legislative history is available online at:
http://www.legis.state.pa.us/cfdocs/billInfo/bill_history.cfm?syear=2011&sind=0&body=H&type=B&bn=75 (last accessed January 15, 2014).

[2] The Petitioners expressly limit their challenges to Megan's Law registration as it applies to juvenile offenders who are not subject to a sexually violent delinquent child assessment. [Juvs.' Brief in Support, 4/22/13, pg. 17, fn. 25.] This distinction is significant insofar as sexually violent delinquent children are afforded a hearing at which they may dispute whether they are mentally ill and dangerous. 42 Pa.C.S.A. § 9799.12 (defining sexually violent delinquent child as one determined to be in need of involuntary treatment under Title 42); 42 Pa.C.S.A. § 6403 (hearing to determine if juvenile is in need of involuntary treatment).

November 2, 2012, and December 20, 2012, Judge Mark issued similar orders for B.B. and N.S., respectively.

On December 20, 2012, Megan's Law IV went into effect and the Juveniles were required to register.

On February 18 or 19, 2013, the Juveniles, through their Assistant Public Defender Syzane Arifaj, filed the instant "Motion For *Nunc Pro Tunc* Relief."

On March 19, 2013, the Juvenile Law Center entered its appearance as co-counsel for the five juvenile registrants, and limited its representation to the review of the Motion for Nunc Pro Tunc Relief.

On April 22, 2013, the Juveniles submitted a Brief in Support.

On April 23, 2013, we held a hearing on the Motion. The Commonwealth presented no evidence at the hearing, electing to rely exclusively on legal argument. Attached to their Brief, the Juveniles submitted numerous exhibits from various medical and psychological experts, along with various other documents regarding juvenile sexual offenders.

On May, 24, 2013, the Commonwealth filed a Brief in Opposition.

On June 13, 2013, the Juveniles filed a Reply Brief. The Juveniles raise five claims in the instant Motion and briefs.

First, the Juveniles claim that Megan's Law IV is an ex post facto law. Addressing whether the law is punishment, the Juveniles argue that Megan's Law IV is punitive in effect ("Claim One"). The Juveniles distinguish prior case law by pointing to increased reporting requirements, as well as the fact that the law has never been applied to juveniles before. Moreover, they argue "when applied to juveniles, a population that is neither mature nor self-

reliant, more amenable to rehabilitation and unlikely to recidivate, the punitive effects are amplified." [Juvs.' Brief in Support, 4/22/13, pg. 45.]

Second, the Juveniles claim that mandatory lifetime registration, without benefit of a hearing, creates an irrebuttable presumption in violation of the Pennsylvania Constitution's guarantee of due process ("Claim Two"). Specifically, the alleged presumption is: "that children adjudicated delinquent of the enumerated offenses require lifetime registration based solely on their juvenile adjudication, regardless of their rehabilitation following treatment, likelihood of recidivism, natural maturation and desistance over time, or need to be placed on a registry." [Juvs.' Brief in Support, 4/22/13, pgs. 57-58.]

Third, the Juveniles argue that lifetime registration under Megan's Law is cruel and unusual punishment ("Claim Three"). The Juveniles rely, in part, on the recent U.S. Supreme Court case of Miller v. Alabama to argue that the differences between an adult and a child sexual offender amplifies the registry's effects and makes registration cruel and unusual. [Juvs.' Brief in Support, 4/22/13, pg. 64.]

Fourth, the Juveniles argue that the statute imposes a stigma by labeling them as a sexual offender for life, thereby infringing on their fundamental right to reputation ("Claim Four"). The Juveniles' argument is based on the Pennsylvania Constitution, which contains an explicit guarantee of a person's right to acquire, possess, and protect reputation.[3]

Fifth, and finally, the Juveniles claim that Megan's Law is in conflict with certain provisions of the Juvenile Act ("Claim Five"). This claim is, in turn, divided into two separate arguments. First, the Juveniles argue that the Juvenile Court is without jurisdiction to impose a punishment, i.e. Megan's Law registration, where that punishment extends past age twenty-one.

---

[3] Pa. Const. Art. I, § 1.

4

Second, the Juveniles argue that Megan's Law registration undermines the rehabilitative purposes of the Juvenile Act.

In addition to responding to these arguments, the Commonwealth objects that the Juveniles' Motion is untimely under Pa.R.J.C.P. 622. We will address this objection first.

Commonwealth's Objection: Timeliness of Petition under Pa.R.J.C.P. 622

The Commonwealth claims that the Juveniles' Motion is untimely under Pa.R.J.C.P. 622 because it was not filed as soon as possible. Specifically, the Commonwealth contends that the Juveniles filed their motion for relief sixty days after the effective date of Megan's Law IV and that the Juveniles provide no explanation to justify the delay in their initial filing. [Com.'s Brief, 5/24/13, pgs. 4-6.] The Juveniles responded that the effective date of Megan's Law IV was the first date any alleged error was known. [Juvs.' Reply Brief, 6/13/13, pgs. 1-4.] The Juveniles point out that the legislature may have continued to amend Megan's Law prior to its effective date[4] and that many juveniles across the state were released from supervision prior to the imposition of registration, which would have rendered their claims moot. [Juvs.' Reply Brief, 6/13/13, pgs. 1-4.] Furthermore, the sixty day delay was necessary because it was caused, in part, by the Juveniles and their families realization of the requirements of registration as it occurred after the effective date, taking time to consult with their attorneys, and waiting to file their petitions together in the interests of judicial economy. [Id.]

Pennsylvania Rule of Juvenile Court Procedure 622 states that:

A. Timing. A motion for *nunc pro tunc* relief shall be filed by the juvenile with the clerk of courts in the court in which the alleged error occurred as soon as possible but no later than sixty days after the date that the error was made known.

Pa.R.J.C.P. 622 (effective April 1, 2012).

---

[4] One such amendment had already occurred. See fn. 1, above.

5

Initially, we do not believe that this case falls under the procedural rule we have just quoted. As the Rule states, the juvenile's motion shall be filed "in the court in which the alleged error occurred." Pa.R.J.C.P. 622. This implies that the error was a court order or at least occurred in court. However, we discern no alleged error in court or by the Court. The Court's prior orders did not make the Juveniles registrable and neither was it necessary to enter such orders before they became registrable. See 42 Pa.C.S.A. § 9799.23(b)(1). Prior to providing notice of the registration requirements, the Honorable Judge Jonathan Mark determined that the Juveniles met the definition of 'juvenile offenders' and so were subject to registration. Judge Mark's orders were issued to provide the Juvenile's ample notice of the registration requirements, prior to the effective date of December 20, 2012. These orders were entered before any constitutional challenge was filed. The Juveniles do not challenge Judge Mark's determinations that the statutory definition of 'juvenile offender' applies to them; instead, they argue that Megan's Law registration is unconstitutional. In any case, the parties have not argued the applicability of the Rule. Even if the Rule does apply, we find that the filing is not untimely.

Here, the alleged 'error' was known when Megan's Law IV registration went into effect, i.e. December 20, 2012. The Juveniles obviously needed significant time to research and prepare their complex legal claims, which required factual development in the form of expert affidavits and raised novel legal theories. The Juveniles also took the time to file their motions jointly. Undoubtedly, this joinder and the Juveniles' preparations significantly improved the efficiency of these proceedings and saved the Court and the parties substantial time. Based on the above, we find that the sixty day delay was "as soon as possible" in this case.

Additionally, we are unsure whether the actual delay was sixty days or sixty-one days. After a review of the filings, the timestamp on the Juveniles' initial motion is illegible and

6

might read either February 18, 2013, i.e. exactly sixty days after December 20, 2012, or February 19, 2013, sixty-one days thereafter. Both parties have proceeded believing that the Juveniles filed within sixty days of the law's effective date. [Com.'s Brief, 5/24/13, pg. 4; Juvs.' Reply Brief, 6/13/13, pg. 3.] Considering that the parties have not disputed this issue, and we can discern no prejudice to the Commonwealth from an additional delay of one day, we will give the Juveniles the benefit of the doubt that they filed within the sixty day timeframe and we decline to dismiss the petition under Pa.R.J.C.P. 622.

### Petitioners' Claim Five: Inconsistency with the Juvenile Act

We first address the Petitioners' Fifth Claim because that claim raises non-constitutional grounds. We could not reach the constitutional claims if the Petitioners' Motion was disposable on statutory grounds. P.J.S. v. Pennsylvania State Ethics Comm'n, 723 A.2d 174, 176 (Pa. 1999) ("When a case raises both a constitutional and a non-constitutional issue, a court should not reach the constitutional issue if the case can properly be decided on non-constitutional grounds").

First, the Petitioners argue that Megan's Law IV imposes "penalties or conditions of disposition extending beyond the child's twenty-first birthday." [Juvs.' Brief in Support, 4/22/13, pg. 74.] Therefore, Megan's Law IV impermissibly extends the actions of the Juvenile Court outside the scope of its jurisdiction. Second, the Petitioners argue that Megan's Law IV is inconsistent with the rehabilitative purposes of the Juvenile Act.

"The object of all interpretation and construction of statutes is to ascertain and effectuate the intention of the General Assembly. Every statute shall be construed, if possible, to give effect to all its provisions." 1 Pa.C.S.A. § 1921. However, "[w]henever the provisions of

7

two or more statutes enacted finally by different General Assemblies are irreconcilable, the statute latest in date of final enactment shall prevail." 1 Pa.C.S.A. § 1936.

With respect to the Petitioners' first claim, they incorrectly believe that Megan's Law IV requires the Court to exercise 'jurisdiction' over them. No judicial determination subjects the Petitioners to registration.[5] At most, Megan's Law IV requires the Court to notify the juveniles that they are subject to registration. 42 Pa.C.S.A. § 9799.20; 42 Pa.C.S.A. § 9799.23.[6] This is not a disposition or an order subjecting them to registration, no more than if the Pennsylvania State Police informed the Petitioners of their obligation to register. As such, the Petitioners' first argument fails.

The Petitioners' second argument invokes the purposes of the Juvenile Act and argues that Megan's Law IV and the Juvenile Act are contradictory.

The Juvenile Act has undergone various iterations during its approximately one-hundred year presence in Pennsylvania's lawbooks. See Com. v. Fisher, 62 A. 198 (Pa. 1905) (discussing delinquency proceedings under law passed in 1903). At its core, the law has remained an alternative to criminal proceedings, aimed at rehabilitating children:

> The proceedings in [Juvenile Court] are not in the nature of a criminal trial but constitute merely a civil inquiry or action looking to the treatment, reformation and rehabilitation of the minor child. Their purpose is not penal but protective,— aimed to check juvenile delinquency and to throw around a child, just starting, perhaps, on an evil course and deprived of proper parental care, the strong arm of the State acting as parens patriae. The State is not seeking to punish an offender but to salvage a boy who may be in danger of becoming one, and to safeguard his adolescent life. Even though the child's delinquency may result from the commission of a criminal act the State extends to such a child the same care and training as to one merely neglected, destitute or physically handicapped. No

---

[5] See discussion above, regarding Judge Mark's prior orders.

[6] Certain members of the executive branch may also be required to notify the juveniles that they are subject to registration, "as appropriate." 42 Pa.C.S.A. § 9799.20. For the legislature to mandate this Court to act as its agent in providing the juveniles' notice is, perhaps, a violation of the separation of powers doctrine. However, this is irrelevant to the issues at bar considering that the notification is merely for informational purposes and does not actually subject the juveniles to registration.

8

suggestion or taint of criminality attaches to any finding of delinquency by a Juvenile Court.

In re Holmes, 109 A.2d 523, 525 (Pa. 1954).[7]

Policies underlying our juvenile system, while evolving, still emphasize rehabilitation and protection of our youth. In re J.H., 737 A.2d 275, 278 (Pa. Super. Ct. 1999). The current version of the Juvenile Act attempts to balance rehabilitation, preservation of the family, and protection of the community. 42 Pa.C.S.A. § 6301. The Act is intended to provide "supervision, care and rehabilitation... [in order to further] the development of competencies to enable children to become responsible and productive members of the community." 42 Pa.C.S.A. § 6301(b)(2).

In part, juvenile proceedings exchange certain criminal protections for diminished consequences. See In Interest of J.F., 714 A.2d at 470 (no right to jury trial in juvenile proceedings). "Juvenile proceedings, by design of the General Assembly, have always lacked much of the trappings of adult criminal proceedings." In re T.P., 2013 PA Super 280 at *7 (Pa. Super. Ct. Oct. 21, 2013). The juvenile proceedings are "intimate, informal and protective in nature." Id.; 42 Pa.C.S.A. § 6336(a) (juvenile proceedings shall be conducted in an informal but orderly manner).

The special treatment provided to criminal offenders by the Juvenile Act is not a constitutional requirement. Com. v. Cotto, 753 A.2d 217, 223 (Pa. 2000); Com. v. Hughes, 865 A.2d 761, 777 (Pa. 2004). Prior to the twentieth century, there were no juvenile courts in this Commonwealth at all. Cotto, 753 A.2d at 224.

---

[7] The appellate courts have continued to cite Holmes with approval, despite subsequent versions of the Juvenile Act which have introduced the purpose of community protection and balanced and restorative justice. See In Interest of J.F., 714 A.2d 467, 473 (Pa. Super. Ct. 1998) (discussing the language in Holmes and stating "[t]he present scheme of the Act effectively retains this worthwhile goal, despite a greater emphasis on the protection of the public and the accountability of juvenile offenders, especially in regard to violent crimes"). Furthermore, juvenile proceedings are still considered to be "merely a civil inquiry or action looking to the treatment, reformation, and rehabilitation of the minor child." In re J.B., 39 A.3d 421, 426 (Pa. Super. Ct. 2012).

9

In short, the Juvenile Act represents the legislature's attempt to balance the needs of juvenile rehabilitation and community protection. Treatment under the Juvenile Act is not constitutionally guaranteed, but is a product of statute.

In comparison, the primary focus of Megan's Law IV is to protect the community. 42 Pa.C.S.A. §9799.11. The law identifies certain juvenile offenders and adds them to the sexual offender registry. 42 Pa.C.S.A. §9799.12 (defining juvenile offenders); 42 Pa.C.S.A. § 9799.15(a)(4) (requiring registration). This is aimed at the vital purpose of preventing sexual re-offense. 42 Pa.C.S.A. 9799.10(a).

While the Juvenile Act implies a different focus when it was drafted, this does not preclude Megan's Law IV from taking effect. The General Assembly is free to change its mind as to what constitutes sound policy. So long as the General Assembly acts within the strictures of the constitution, it may require additional protections from those children who have engaged in criminal conduct. Nor is there reason to think that a provision of Megan's Law IV creates an irreconcilable difference with the Juvenile Act. At most, Megan's Law IV constitutes a shift in policy which provides a different context in which to interpret the Juvenile Act.[8] This shift in policy is not different in kind than the shift which occurred through the amendments to the Juvenile Act in 1995.

For the above reasons, the Petitioners' claims with respect to the Juvenile Act fail.[9]

We will now address the Petitioners' second and fourth claims, considering that our disposition on those claims is dispositive of this petition.

---

[8] Even if there was an irreconcilable difference with Megan's Law IV, the Juvenile Act would be superseded since the later-enacted statute takes priority.
[9] Claim Five partly relies on whether Megan's Law IV constitutes punishment. However, we do not rule on this issue as it is not necessary to our disposition on this claim.

10

<u>Petitioners' Claims Two & Four: Reputation, Irrebuttable Presumption, and Due Process</u>

The Petitioners claim that Megan's Law IV creates an irrebuttable presumption that violates due process (Claim Two). Furthermore, the Petitioners claim that Megan's Law IV infringes on their right to reputation without substantive due process (Claim Four). These issues are interrelated. The Petitioners' right to reputation receives the highest level of judicial scrutiny and will be analyzed first. Building from that analysis, we will briefly discuss the Petitioners' irrebuttable presumption claim.

Duly enacted legislation carries with it a strong presumption of constitutionality. Com. v. Swinehart, 664 A.2d 957, 961 (Pa. 1995). The presumption of constitutionality will not be overcome unless the legislation is clearly, palpably, and plainly in violation of the constitution. Id. A party may contest the constitutionality of a statute on its face or as-applied. Com. v. Brown, 26 A.3d 485, 493 (Pa. Super. Ct. 2011).

> A facial attack tests a law's constitutionality based on its text alone and does not consider the facts or circumstances of a particular case. An as-applied attack, in contrast, does not contend that a law is unconstitutional as written but that its application to a particular person under particular circumstances deprived that person of a constitutional right.

Id. citing U.S. v. Marcavage, 609 F.3d 264, 273 (3d Cir. 2010).

"The touchstone of due process is protection of the individual against arbitrary action of the government." Wolff v. McDonnell, 418 U.S. 539, 558 (1974).

> All men are born equally free and independent, and have certain inherent and indefeasible rights, among which are those of enjoying and defending life and liberty, of acquiring, possessing and protecting property and reputation, and of pursuing their own happiness.

Pa. Const. Art. I, § 1.

> All courts shall be open; and every man for an injury done him in his lands, goods, person or reputation shall have remedy by due course of law, and right and justice administered without sale, denial or delay. Suits may be brought against

11

the Commonwealth in such manner, in such courts and in such cases as the Legislature may by law direct.

Pa. Const. Art. I, § 11.

"'Character' and 'reputation' are not synonymous terms. The former is what a man is, the latter is what he is supposed to be." Hopkins v. Tate, 99 A. 210, 212 (Pa. 1916) (discussing the Rules of Evidence). Regarding reputation and character:

> A man may, with or without his fault, have a bad reputation for honesty in the neighborhood in which he then resides; but removing therefrom he may, after living in another and distant place for several years and leading an honest and upright life, acquire a good reputation in the latter community. His character may not undergo a change, but his reputation in the two places is not the same.

Hopkins, 99 A. at 212.

Under the U.S. Constitution, reputation is not an interest which, standing alone, is sufficient to invoke the procedural protections of the Fourteenth Amendment's due process clause. Paul v. Davis, 424 U.S. 693 (1976); see also Com. v. Maldonado, 838 A.2d 710, 714 (Pa. 2003) (Megan's Law case, noting that reputation is not sufficient to trigger due process under *Paul v. Davis*); Com. v. Mountain, 711 A.2d 473, 478 (Pa. Super. Ct. 1998) (also citing *Paul v. Davis* and stating that reputation alone is insufficient to trigger due process claims). However, under the Pennsylvania Constitution, reputation is "a fundamental interest which cannot be abridged without compliance with constitutional standards of due process and equal protection." R. v. Com., Dep't of Pub. Welfare, 636 A.2d 142, 149 (Pa. 1994) citing Hatchard v. Westinghouse Broadcasting Co., 532 A.2d 346, 350 (Pa. 1987).

Pennsylvania's Constitution requires the same due process analysis as the Federal Constitution. Pennsylvania Game Comm'n v. Marich, 666 A.2d 253, 255 fn. 6 (Pa. 1995). Like the due process clause in the Fourteenth Amendment of the Federal Constitution, Article I Section 1 of the Pennsylvania Constitution guarantees certain inalienable rights. Nixon v. Com.,

12

839 A.2d 277, 286 (Pa. 2003). "While the General Assembly may, under its police power, limit those rights by enacting laws to protect the public health, safety, and welfare, any such laws are subject to judicial review and a constitutional analysis." Nixon, 839 A.2d at 286 (citations omitted). "The constitutional analysis applied to the laws that impede upon these inalienable rights is a means-end review, legally referred to as a substantive due process analysis." Id. "Under that analysis, courts must weigh the rights infringed upon by the law against the interest sought to be achieved by it, and also scrutinize the relationship between the law (the means) and that interest (the end)." Id. at 286-87.

Where an infringed right is considered fundamental, the means-end review is known as the 'strict scrutiny' test. Nixon, 839 A.2d at 287. A law may only satisfy strict scrutiny if it is narrowly tailored to a compelling state interest. Id. Because reputation is a fundamental right, infringements of reputation undergo strict scrutiny. Pennsylvania Bar Ass'n v. Com., 607 A.2d 850, 858 (Pa. Cmwlth. Ct. 1992).

The existence of government records containing information that might subject a party to negative stigmatization is a threat to that party's reputation. Pennsylvania Bar Ass'n v. Com., 607 A.2d 850, 853 (Pa. Cmwlth. Ct. 1992) citing Wolfe v. Beal, 384 A.2d 1187, 1189 (Pa. 1978).

An infringement on the right to reputation necessarily implies that the stakeholder will have a remedy. Carlacci v. Mazaleski, 798 A.2d 186, 190 fn. 9 (Pa. 2002) ("Where there is a right, there is a remedy"). For example, due process required a cause of action to stand for petitioners to pursue expungement of certain records, even where no statutory right to expungement existed. Carlacci v. Mazaleski, 798 A.2d 186, 190 (Pa. 2002) (PFA hearing); Wolfe v. Beal, 384 A.2d 1187, 1189 (Pa. 1978) (involuntary commitment); but see Com. v.

13

Charnik, 921 A.2d 1214, 1220 (Pa. Super. Ct. 2007) (records of convictions and PFA hearings resulting in a finding of abuse do not require additional due process protections).

In Pennsylvania Bar Ass'n v. Com., the Commonwealth Court applied strict scrutiny to examine reputational harm done to certain attorneys. Pennsylvania Bar Ass'n v. Com., 607 A.2d 850, 857 (Pa. Cmwlth. Ct. 1992). In that case, the General Assembly had enacted legislation in an attempt to reduce the factors that contribute to higher vehicle insurance costs for consumers. Id. at 852. Part of this initiative included the establishment of a "Motor Vehicle Fraud Index Bureau" where insurers would submit all "suspected fraudulent claims" for listing in the Index. Id. The Index listed both the name of the claimant and the claimant's attorney. Id. The Index was then disseminated to law enforcement officers, member-insurers, the Insurance Department, and similar fraud index bureaus. Id. at 853. The Pennsylvania Bar Association petitioned the Court for declaratory and injunctive relief, arguing that the law violated procedural and substantive due process in denying the attorneys their fundamental right to reputation. Id. The Commonwealth Court agreed. Id. at 857-58. In examining substantive due process, the Court applied the strict scrutiny test and noted that "while some attorneys reported to the Index Bureau might actually be involved in submitting fraudulent claims, all of the attorneys reported will suffer an injury to their right to protect their reputations without benefit of due process." Id. at 858. Furthermore, the Commonwealth "[made] no argument which justifie[d] the broad sweep of the attorney reporting requirements." Id. Consequently, the Court held that "the requirement that attorney names be reported on the basis of an undefined

14

suspicion [was] unconstitutional as a violation of substantive due process." Pennsylvania Bar

Ass'n, 607 A.2d at 858.[10]

Even employing the rational basis test, the Court has sometimes held that a

conviction-based presumption is unconstitutional. In Johnson v. Allegheny Intermediate Unit,

the Commonwealth Court applied rational basis review to a disqualification from employment

based upon a criminal conviction. Johnson v. Allegheny Intermediate Unit, 59 A.3d 10 (Pa.

Cmwlth. Ct. 2012). In that case, petitioner Johnson began employment for the Allegheny

Intermediate Unit in 2004. Id. at 13-15. Johnson was trained as a "Fatherhood Facilitator" and

counseled juvenile fathers about child development and their role in child development. Id. In

2011, the General Assembly passed a law banning employment with school children for any

person convicted of felony homicide. Id. As it turned out, the petitioner had been convicted of

voluntary manslaughter twenty-eight years before. Id. The petitioner was fired in accordance

with the law and subsequently he brought suit, arguing that the lifetime ban violated his due

process rights. Id. at 15-16. As the law did not infringe on a fundamental right, the Court

employed the rational basis test. Id. at 21. Allegheny argued that the purpose of the law was to

regulate employment so that there would be a safe school environment for children. Id. at 22.

However, Johnson's work was exemplary and Allegheny admitted that Johnson would not have

been fired but for the law. Id. at 24-25. The Court considered the nature of the offending

conduct and its remoteness in time; such circumstances "must be considered where an agency

seeks to revoke a professional license on the basis of a conviction." Id. at 24. Considering the

facts, the Court concluded "[because the law] creates a lifetime ban for a homicide offense that

has no temporal proximity to Johnson's present ability to perform the duties of his position, and it

---

[10] The Court also examined procedural due process and likewise found that the law was unconstitutional. Pennsylvania Bar Ass'n, 607 A.2d at 857. The Court noted that there was no notice to the attorneys or opportunity for them to raise objections to the listing. Id.

15

does not bear a real and substantial relationship to the Commonwealth's interest in protecting children, it is unreasonable, unduly oppressive and patently beyond the necessities of the offense." Id. at 25. Considering Johnson's diminishing risk over time as well as Johnson's actual and current danger to children, the lifetime ban on employment was not rationally related to a legitimate government interest. See id. (considering the facts and holding law unconstitutional).

For Megan's Law, the Courts have already considered various due process claims, including challenges to the sentencing enhancement provisions included in the statute. Compare Com. v. G. Williams, 832 A.2d 962, 986 (Pa. 2003) (striking down Megan's Law II sentence increase when it triggered after judge's finding that offender was a sexually violent predator) with Com. v. Killinger, 888 A.2d 592, 596-97 (Pa. 2005) (upholding Megan's Law II sentence increase when it only triggered after a criminal conviction afforded the protection of a jury trial).

## Harm to Reputation

Here, we must first determine whether the protections of due process trigger, i.e. whether the Petitioners suffer any harm to their reputations because of Megan's Law IV. Focusing entirely on the trigger for strict scrutiny, the Commonwealth argues that Megan's Law IV does not harm a juvenile offender's reputation. Specifically, the statute employs language similar to common vocabulary and calls juveniles nothing worse than what their actions warrant. All registrable juveniles have been found delinquent of Rape, I.D.S.I., Aggravated Indecent Assault, or an attempt, solicitation, or conspiracy to commit one of these crimes. 42 Pa.C.S.A. § 9799.12 (defining 'juvenile offender'). One who rapes is a rapist, as the Commonwealth says, and being called a rapist is no more stigmatizing than being called a sexual offender. Furthermore, since registration is premised on what the juveniles have actually done, any

16

reputational harm is not the fault of the Commonwealth; thus, the Petitioners' right to reputation has not been threatened by Megan's Law IV. After careful consideration, we disagree.

The Commonwealth essentially tells us that a juvenile offender has already damaged his reputation by his own acts and the state should not be held accountable for its publication of these acts in pursuit of protecting the community. While this argument has some persuasive force, Megan's Law IV goes too far.

The primary focus of our inquiry will be the harm to reputation, but we must keep in mind the practical reasons that our commonwealth's constitution protects that reputation. The Juveniles will almost certainly be shunned wherever their registration is known. Presence on a sexual offender registry may impose limits on the Juveniles ability to obtain housing. [Juvs.' Exh. F, Letter of Ineligibility from Johnstown Housing Authority.] Schools may refuse to admit them. Businesses may refuse to employ them. At this point the precise effects of the law are unknown, but its negative consequences are highly likely. Thus, while the Juveniles are not directly banned from a certain activity as per the plaintiff in Johnson, the informational effects of Megan's Law IV are likely to be similar, broader, and more severe. Recognizing this, we consider what Megan's Law IV says about the Juveniles.

The term 'sexual offender' does not simply imply that the juvenile was adjudicated delinquent. Megan's Law IV, like prior versions, contains a section outlining the legislature's findings which state that 'sexual offenders' "pose a high risk of committing additional sexual offenses." 42 Pa.C.S.A. § 9799.11(a)(4). To accomplish its legislative goal, Megan's Law IV requires registration for someone adjudicated delinquent of a certain sexual

17

offense. The law then designates the juvenile delinquent a 'sexual offender,'[11] i.e. someone at a high risk for re-offense, and disseminates this information to various entities.[12] Megan's Law is essentially a state-endorsed reputation rating. The premise that the 'sexual offender' is at a 'high risk of re-offense' is essential to the statute's purpose. The dissemination of information about these dangerous individuals is intended to allow government entities and communities to prepare for them. 42 Pa.C.S.A. § 9799.11(a)(6)-(8) (discussing same). Furthermore, that a juvenile who has been adjudicated delinquent of a certain crime is at a "high risk of re-offense" is more than you could reasonably infer based on the adjudication alone.

The Commonwealth cites federal precedent in response. Considering Connecticut's Megan's Law statute, the U.S. Supreme Court has held that due process did not require a hearing to determine if the adult registrants were "currently dangerous." Connecticut Dep't of Pub. Safety v. Doe, 538 U.S. 1, 4 (2003). Rather than creating a broad rule for due process in Megan's Law cases, the Court's holding was limited to the particular statute. The precise holding was that due process "does not require the opportunity to prove a fact that is not material to the State's statutory scheme." Id. Since the adult registrant's current dangerousness

---

[11] An adult registrant is designated as a 'sexual offender,' while a juvenile registrant is both a 'juvenile offender' and a 'sexual offender.' See 42 Pa.C.S.A. § 9799.12 (defining sexual offender as "[a]n individual required to register under this subchapter").

[12] Megan's Law IV provides that the Pennsylvania State Police shall make a sexual offender's information available to the following state, federal, and local entities:

1) a "jurisdiction" such as a state, where the offender:
   o   is required to register; or
   o   has terminated his residence, employment or enrollment as a student
2) the United States Attorney General, the Department of Justice, and the United States Marshals Service,
3) the county's district attorney, the county's chief probation officer, and the municipalities' chief law enforcement officer, wherever the registrant:
   o   establishes or terminates a residence, or is a transient; or
   o   commences or terminates employment; or
   o   enrolls or terminates enrollment as a student

42 Pa.C.S.A. § 9799.18(a).
Furthermore, the federal authorities will include the registrant's information "in the National Sex Offender Registry, NCIC and any other database established by such Federal agencies." 42 Pa.C.S.A. § 9799.18(a)(3); see also 42 U.S.C.A. § 16919 (establishing National Sex Offender Registry).

18

was immaterial to Connecticut's statute, no hearing was required. Id. However, the instant case is distinguishable. Similar to Connecticut's statute, Pennsylvania registration is triggered by certain adjudications. However, Pennsylvania's statute makes clear that registration follows from these adjudications because the registrant *is* currently dangerous. Even if Megan's Law registration was only concerned with promulgating adjudication information, our State's enhanced protection for reputation has unique implications for due process in these circumstances. Here, the reputation interests at stake are the actual focus of Megan's Law IV. The law is intended to reduce the juvenile's reputation in the eyes of the public in order to ensure protection. Our State's enhanced protection of reputation requires limits on any interpretation which blurs the line between adjudications and more fact-based inferences about those adjudications. For these reasons, we find Connecticut Dep't of Pub. Safety to be distinguishable.[13]

Our conclusion about the effect on the juveniles' reputations is not based only on the legislative findings. It is probable that most laymen and government agents will not even be aware of the provisions of Megan's Law IV which discuss how sexual offenders are dangerous. However, we do not believe that this lessens the intended effect of the law. Common sense, as well as our society's perception of Megan's Law registrants, would lead an average person of reasonable intelligence to conclude that there is something dangerous about the registrant. Once the public is aware of the juvenile's registration, the clear implication is that the Commonwealth thought it necessary to inform them that this person is a sexual offender and therefore dangerous. This is exactly the purpose of the law and we believe the law will be effective. A similar view

---

[13] Since the dispositive issue in Connecticut Dep't of Pub. Safety was whether due process was even triggered, the Court's reasoning is largely unnecessary. Connecticut Dep't of Pub. Safety, 538 U.S. at 7 (conducting inquiry "assuming, *arguendo*, that respondent has been deprived of a liberty interest"). As we have said, federal law does not protect reputation alone. See Paul v. Davis, 424 U.S. 693, 712 (1976) (injury to reputation is not a liberty or property interest triggering due process protections).

19

will be held by persons informed of the juvenile's registration for the rest of the juvenile's life, despite the fact that a particular juvenile's character might be altered after a successful rehabilitation, or simply after he matures and develops. Unlike adult registrants, the registrants here committed these acts while they were children and this forms the most weighty consideration in finding reputational harm.

Being a child implies a unique reputation in our society. For an adult sex offender, there is debatable harm to reputation considering that adults are entirely culpable for their own actions and do not readily alter their characters, if at all. But as a society we recognize that children's characters are not fully-formed, that children are often subject to perverse influences for which they do not yet have an escape, and that children generally bear less culpability than adults owing to their age and circumstances. See Miller v. Alabama, 132 S. Ct. 2455, 2464 (2012) (outlining scientific research supporting common sense regarding children). Through its various iterations over one hundred years, Pennsylvania's juvenile justice system has expressed society's differing perceptions of adults and children. The longstanding presence and purpose of the Juvenile Act shows the general recognition by our society that juveniles are different. Juveniles are separated from adults because they are believed to be more capable of rehabilitation and often more deserving of leniency due to a lesser degree of culpability. See In re Holmes, 109 A.2d at 525 ("The State is not seeking to punish an offender but to salvage a boy who may be in danger of becoming one, and to safeguard his adolescent life"). Children's habits are not solidified and this is contemplated in the law. See 42 Pa.C.S.A. § 6301(b) (rehabilitation). Thus, they often will not need to be deterred or incapacitated as an adult offender would under the criminal justice system. In 1954, our Supreme Court stated that "[n]o suggestion or taint of criminality attaches to any finding of delinquency by a Juvenile Court." In

20

re Holmes, 109 A.2d at 525. While such an absolute remark may not be true today, it is certainly true that children who commit heinous crimes are perceived indulgently in comparison with adults.

Megan's Law IV effectively replaces these considerations which usually soften the judgments of society. Where a child's serious transgressions might have been looked on with a more lenient eye, especially as time passed and wounds were healed, Megan's Law IV will remind us that this person *is* a sexual offender and this reminder will persist for the rest of the juvenile's life. When considering reputation, this kind of reminder is the exact interest at stake.

Furthermore, one of the most essential qualities of reputation is that it may be improved. This situation is even more significant for juveniles because their character is often not firmly set. Thus, a truly rehabilitated juvenile might eventually gain a good reputation to match a good character. However, under Megan's Law IV, lifetime registration will hold the juvenile's reputation in stasis. The law will imbue the juvenile with the reputation of a sexual offender through formative stages of his life and continuing into old age. A juvenile who was adjudicated delinquent when he was fourteen will continue to be known as a sexual offender when he is seventy.

While Pennsylvania Bar Ass'n does not deal with a situation as grave as sexual crime, it still has obvious similarities to the current facts. In Pennsylvania Bar Ass'n, the Court considered how some lawyers would justifiably be put on the list because they filed a fraudulent claim, whereas other lawyers on the list did nothing blameworthy. Despite this variation, the Court found a harm to reputation which triggered constitutional protections. Like Pennsylvania Bar Ass'n, the juvenile offenders are placed on a list which bears a negative connotation for their reputation and the list is then distributed. Some juveniles will deserve to be put on the Megan's

21

Law registry because they are at high-risk to re-offend, whereas others will be mislabeled. Extending the Commonwealth Court's reasoning to its logical conclusion, the inclusion of some dangerous individuals on the Megan's Law registry does not lessen the harm to reputation for the individuals who are not dangerous. Furthermore, an even greater burden to reputation occurs here insofar as sexual offender registration will generally persist for life.

The instant facts have differences to those in Pennsylvania Bar Ass'n, but these differences are not significant enough to distinguish that case. Unlike Pennsylvania Bar Ass'n, the Juveniles' injury to reputation is not grounded on a mere undefined suspicion, but results after an adjudicatory hearing or admission where it is determined that the juvenile has committed an offense. While the adjudicatory hearing undoubtedly provides a procedural protection, this does not lead us to conclude that no reputational harm has occurred. The adjudication and disposition itself is largely irrelevant because it does not consider the appropriateness of the juvenile's presence on the Megan's Law registry. Pennsylvania Bar Ass'n does not imply that there would be a contrary result if there were some grounds for the suspicion. As the Court said, "while some attorneys reported to the Index Bureau might actually be involved in submitting fraudulent claims, all of the attorneys reported will suffer an injury to their right to protect their reputations without benefit of due process." Pennsylvania Bar Ass'n, 607 A.2d at 858. Neither does Pennsylvania Bar Ass'n deal with the distinct and heightened reputational concerns present here, i.e. the high risk of re-offense designation and the peculiar situation of juveniles.

In sum, we hold that Megan's Law IV damages the juveniles' reputations and has triggered strict scrutiny.

<u>Narrowly Tailored to a Compelling State Interest</u>

Megan's Law IV is concerned with protecting the public from the recidivism of persons who have committed sexual offenses and are at a high risk to re-offend. As the law states, "protection of the public from this type of offender is a paramount governmental interest." 42 Pa.C.S.A. § 9799.11(a)(4). Safety or protection is a classic example of a compelling state interest. <u>See</u> <u>Denver Area Educ. Telecommunications Consortium, Inc. v. F.C.C.</u>, 518 U.S. 727, 754-55 (1996) (protecting physical and psychological well-being of minors was a compelling state interest). Accordingly, we hold that Megan's Law IV clearly has a compelling state interest.

The second step in strict scrutiny review is more difficult and places the burden of proof on the government to show that the law is narrowly-tailored to the compelling state interest. <u>Citizens United v. Fed. Election Comm'n</u>, 558 U.S. 310, 340 (2010) (state's burden of proof). A statute is not narrowly tailored when a "less restrictive alternative [to accomplish the legislative goal] is readily available." <u>Boos v. Barry</u>, 485 U.S. 312, 329 (1988) (existence of a less restrictive statute suggested that a challenged ordinance, aimed at the same problem, was overly restrictive). Neither is a statute narrowly tailored if it is over-inclusive, covering situations which are not pertinent to the legislative goal. <u>See</u> <u>Simon & Schuster, Inc. v. Members of New York State Crime Victims Bd.</u>, 502 U.S. 105, 118 (1991) (to compensate victims, statute controlling literary endeavors of authors admitting to crime was over-inclusive, as it also applied to authors never actually accused or convicted).

As we have already noted, the Commonwealth did not present evidence or argument on how Megan's Law IV is narrowly-tailored. The Commonwealth elected to focus on

23

whether the Petitioners' reputations were harmed. Thus, we are forced to rely primarily on the Petitioner's evidence in assessing this prong.

In examining the narrowly tailored requirement, we first acknowledge the General Assembly's difficulty in attempting to craft appropriate regulation for sex offenders. On the one hand, both adult and juvenile sexual offenders might pose a future danger to the public. Megan's Law attempts to deal with this danger by essentially creating a government-managed reputation system. However, among adults and juveniles the risk of re-offense is by no means the same. The recidivism rate for adult sexual offenders has been estimated at 13% or higher, while the most extensive study of juvenile sexual recidivism rates (collecting 63 studies and surveying 11,200 juveniles) concludes that juvenile offenders recidivate in 7.09% of cases. [Juvs.' Exh. J, Aff. of Michael F. Caldwell, Psy.D.; Exh. I, Aff. of Dr. Elena del Busto, M.D.] The real recidivism rate over a sexual offender's lifetime may be higher than these statistics reveal. Of course, any study will be practically constrained to pick some point in time to stop research (on average, the juvenile studies stopped collecting data 5 years after the initial adjudication). Thus, any recidivism that occurred after that time is not accounted for. Furthermore, not all sexual re-offenses are reported. This means that the actual recidivism rate for juveniles could be higher than assessed and falls short of total accuracy.

Predictions for juvenile sexual offenders pose additional problems. For juvenile sexual offenders, "it is extremely difficult to identify the small subgroup of offenders who pose a high risk of sexual re-offense." [Juvs.' Exh. J, Caldwell, Psy.D.] This is because juvenile sexual recidivism is relatively low, for scientific purposes, and this makes identifying risk-increasing elements more difficult. [Juvs.' Exh. J, Caldwell, Psy.D.] Nevertheless, Megan's Law IV uses the fact of an adjudication alone to determine if a particular individual should be put on the

24

registry. We are unaware, and the parties do not suggest, what factual background or research the legislature considered before enacting Megan's Law IV. But even if the legislature were to preface its legislation with very extensive research it is hard to see how it would be possible to create an adjudication-based registry to cover only those juveniles who are, in fact, dangerous.

Megan's Law IV does differentiate between adult and juvenile sexual offenders. Adults and juveniles are subject to registration for different offenses and, unlike adults, juveniles will not be registrable unless they are at least fourteen years of age at the time of the offense. For a juvenile to be registrable he must: (1) be adjudicated delinquent of Rape, I.D.S.I., Aggravated Indecent Assault, or an attempt, solicitation, or conspiracy to commit the same; and (2) be 14 years old or older when he engaged in the registrable conduct. 42 Pa.C.S.A. § 9799.12. On the other hand, Megan's Law IV makes adult offenders registrable for approximately forty-eight (48) different crimes. 42 Pa.C.S.A. § 9799.14. This tally does not account for similar crimes in foreign jurisdictions, inchoate crimes, or repealed registrable offenses in this Commonwealth. Presumably, the offenses which make a juvenile registrable imply a higher risk of re-offense. Megan's Law IV does not place a juvenile's information on the in-state public website. 42 Pa.C.S.A. § 9799.28.[14] While Megan's Law IV provides no confidentiality protections and disseminates the registrant's information to various parties,[15] public dissemination of a juvenile's information will not necessarily occur. By these distinctions the legislature has tried to balance the need to rehabilitate juvenile offenders, while also protecting the community through registration.

---

[14] Petitioners contend that, nevertheless, Megan's Law IV requires the juveniles' information to be disseminated to state and federal agencies that will include their registration information online. Thus, argue the Petitioners, Megan's Law IV effectively places their information online.

[15] See fn. 12, above, discussing who receives a registrant's information.

Nevertheless, while Megan's Law implies an effort to limit juvenile registration, it fails to be narrowly tailored. Megan's Law IV is most problematic in that it is over-inclusive; the law requires registration by juveniles who are not at a high risk of re-offense. A juvenile offender's circumstances may vary, even for the heinous crimes involved. The law's lack of any individualized inquiry leaves significant questions unanswered pertaining to the juvenile's risk of recidivism. For instance, what is the juvenile's background? Was the initial adjudication born of a momentary lapse or was it a continuing pattern of behavior? Were there significant contributing factors in the juvenile's crime, such as peer pressure or a poisonous home environment? Was the juvenile previously subject to sexual or physical abuse? For how long? Has he now moved to a new and stable environment? Has he re-offended or been tempted to re-offend? Has the juvenile shown signs of rehabilitation or recovery? Is he now married, employed, in school, involved in his community, or engaged in other productive and supportive roles which would diminish the risk of re-offense? Consideration of such questions is analogous to the murder sentencing factors. See 18 Pa.C.S.A. § 1102.1 (for murder sentence, considering particular circumstances of a juvenile before deciding eligibility for parole).[16] By spelling out these considerations we do not mean to imply that the legislature must require some particular set of questions or questionnaire before it could require registration. However, Megan's Law IV is over-inclusive by not accounting for individualized circumstances, thereby ignoring a means to avoid including non-dangerous persons on the registry. It would be no answer to say that the future dangerousness of sexual offenders is too speculative and unknowable for determination at the time of adjudication, for this is simply to acknowledge that the law will sweep up those who are not dangerous.

---

[16] This statute was passed in response Miller v. Alabama, 132 S. Ct. 2455 (2012).

Furthermore, other statutory provisions suggest that the adjudication-based system for registration is not the least restrictive means that could have been chosen.[17] The legislature has tasked the court with judging whether a particular sexual offender should be classified as a sexually violent predator "due to a mental abnormality or personality disorder that makes the individual likely to engage in predatory sexually violent offenses." 42 Pa.C.S.A. § 9799.12 (definitions); 42 Pa.C.S.A. § 9799.24(e) (hearing for assessment). The Sexual Offender Assessment Board is tasked with assisting the Court in examining whether the sexual offender is a sexually violent predator. 42 Pa.C.S.A. § 9799.24(b). After a court order, the Board will gather the following information for the Court's review:

(1) Facts of the current offense, including:
    (i) Whether the offense involved multiple victims.
    (ii) Whether the individual exceeded the means necessary to achieve the offense.
    (iii) The nature of the sexual contact with the victim.
    (iv) Relationship of the individual to the victim.
    (v) Age of the victim.
    (vi) Whether the offense included a display of unusual cruelty by the individual during the commission of the crime.
    (vii) The mental capacity of the victim.
(2) Prior offense history, including:
    (i) The individual's prior criminal record.
    (ii) Whether the individual completed any prior sentences.
    (iii) Whether the individual participated in available programs for sexual offenders.
(3) Characteristics of the individual, including:
    (i) Age.
    (ii) Use of illegal drugs.
    (iii) Any mental illness, mental disability or mental abnormality.
    (iv) Behavioral characteristics that contribute to the individual's conduct.
(4) Factors that are supported in a sexual offender assessment field as criteria reasonably related to the risk of reoffense.

42 Pa.C.S.A. § 9799.24(b).

---

[17] We employ the U.S. Supreme Court's suggestion of considering similar provisions to determine if there is a less restrictive means available. Boos v. Barry, 485 U.S. 312, 329 (1988) (existence of a less restrictive statute suggested that a challenged ordinance, aimed at the same problem, was overly restrictive).

27

The Court then uses this information, in part, to determine whether the sexual offender is a sexually violent predator. The legislature considered this level of individual analysis appropriate, at least in these circumstances. While the legislature concluded that Megan's Law IV needed to be "strengthened," strengthening the law did not mean excluding a sexually violent predator assessment, which was already present in prior versions.[18] Similarly, the legislature also required a court hearing for "sexually violent delinquent children." 42 Pa.C.S.A. § 9799.12 (referring to § 6402 for definition of sexually violent delinquent child); 42 Pa.C.S.A. § 6402 (defining sexually violent delinquent child as one involuntarily committed under § 6403). The standard employed is deferential to the juvenile; it must be shown by "clear and convincing evidence" that the juvenile "has a mental abnormality or personality disorder which results in serious difficulty in controlling sexually violent behavior that makes the person likely to engage in an act of sexual violence." 42 Pa.C.S.A. § 6403(d). Thus, the legislature has already indicated that it believes the individualized consideration of circumstances is a reasonable means of carrying out the law's purpose; this supports the notion that adjudication-based registration is over-inclusive.

Similar to Pennsylvania Bar Ass'n, the statute will include persons both relevant and irrelevant to the legislative aim. However, an unchallengeable, *per se* conclusion that all juvenile offenders require Megan's Law registration for at least twenty-five years discards reasonable, alternative protections which could be put in place, such as an individualized inquiry into the risks of a particular juvenile.

We also consider the holding in Johnson. While Johnson only applied the rational basis test, a considerably more deferential standard of review, the Court nevertheless struck

---

[18] Specifically, the Court already conducted sexually violent predator assessments for adults pursuant to Megan's Law III. As we have said, this is the first time that juveniles have been required to register and, thus, no individual juvenile assessments occurred in prior versions of Megan's Law.

28

down a law which presumed dangerousness based upon a criminal conviction. Here, Megan's Law IV infringes on a fundamental right and presumes that the juvenile is dangerous throughout his life based upon an adjudication alone. But if a conviction-based presumption of dangerousness is not rationally related to protection because it fails to account for individual circumstances, it follows that neither is such a presumption narrowly tailored. The infringement of a fundamental right must be more carefully justified to survive scrutiny.[19]

Additionally, the legislature has historically selected certain crimes considered heinous in nature for direct filing in the criminal division when committed by juveniles fifteen years of age and over, thus, at a minimum, invoking constitutional protections when the potential consequences are the same or similar to adult defendants. 42 Pa.C.S.A. § 6302 (defining "delinquent act"); see also Com. v. Ramos, 920 A.2d 1253, 1257 (Pa. Super. Ct. 2007). We note that the adjudicatory hearing does not encompass the full panoply of criminal protections. Such hearings are conducted "in an informal but orderly manner"[20] and the parties often adopt a less adversarial attitude than in the criminal setting. Thus, adjudications of delinquency enjoy less procedural protections than adult registrants. Where the fundamental right to reputation is at stake, however, the determination is of constitutional magnitude and should enjoy some appropriate, heightened protection. We do not hold or imply that a jury trial, or other specific criminal protections, are constitutionally required in juvenile proceedings. Neither do we hold that criminal protections are required prior to a juvenile's sexual offender registration. Rather, the lack of these constitutional protections is merely suggestive of how Megan's Law IV fails to consider that the registration issues at stake are of constitutional magnitude for the Juveniles.

---

[19] In assessing harm, we have noted how Johnson banned employment based upon the criminal proceeding, whereas Megan's Law IV disseminates information after the adjudication. However, this dissemination of information is likely to have similar practical effects on the Juveniles' employment, housing, and education.

[20] 42 Pa.C.S.A. § 6336(a) (Conduct of Hearings under Juvenile Act).

29

Before concluding, we also note that we have reviewed both the state and federal legislative histories for reasoning or evidence which supports the premise that the adjudication-based registration is closely tied to juveniles at a high risk of re-offense. We have found none.

As far as Pennsylvania's legislative record is concerned, we have found no helpful discussion. Pennsylvania legislators indicated that Megan's Law IV extended registration to transient offenders,[21] allowed for increased information sharing on national registries,[22] and brought Pennsylvania in compliance with the federal Adam Walsh Act of 2006. Compliance with the Adam Walsh Act was necessary to avoid a $1.6 million reduction in a federal grant,[23] and also to make Pennsylvania less attractive to sexual offenders from foreign jurisdictions who might otherwise elect to move to the state if Pennsylvania maintained lesser reporting requirements. We have found no discussion of the appropriateness of juvenile registration on the available record.[24]

Since Megan's Law IV was partly designed to comply with the Adam Walsh Act, we have also reviewed the federal legislative record. The Adam Walsh Act of 2006 was broad-ranging and addressed multiple issues for both adult and juvenile sexual offenders. In part, the federal legislation sought to eliminate the disparity between registration for adult and juvenile

---

[21] S.B. 1183, Legislative Journal—Senate, pg. 1203-04, November 15, 2011 (statement of Senator Orie). Available online at: http://www.legis.state.pa.us/WU01/LI/SJ/2011/0/Sj20111115.pdf#page=5.

[22] S.B. 1183, Legislative Journal—House, pg. 2551, December 13, 2011 (statement submitted by Representative Caltagirone). Available online at: http://www.legis.state.pa.us/WU01/LI/HJ/2011/0/20111213.pdf#page=15.

[23] S.B. 1183, Legislative Journal—House, pg. 2552, December 13, 2011 (statement submitted by Representative Marsico).

[24] At most, the record reveals that two senators objected to the juvenile provisions before the final vote. S.B. 1183, Legislative Journal—Senate, pg. 1373-74, December 14, 2011 (statements of Senators White and Ferlo). Available online: at http://www.legis.state.pa.us/WU01/LI/SJ/2011/0/Sj20111214.pdf#page=13.

offenders.[25] It also was intended to create a uniform system of registration among the states in order to enhance the accuracy and usefulness of Megan's Law registries.[26]

After reviewing the congressional record, the limited registration of juvenile offenders appears to have been part of a pragmatic compromise on the part of Congress, rather than an attempt to limit juvenile registration to those who were at a high risk for re-offense. One senator opined that:

> [I]n order for the registry to be effective, it should be targeted toward those who represent the highest risk to our communities. The current version takes a more sweeping approach toward juvenile offenders by expanding their registration requirements. The Senate bill allowed each State to determine whether a juvenile should be included on the registry. This compromise allows some offenders over 14 to be included on registries, but only if they have been convicted of very serious offenses. For juveniles, the public notification provision in this bill is harsh given their low rate of recidivism, which is less than 8 percent according to the most recent studies. For this reason, it is especially important that the bill includes funding for treatment of juvenile offenders. These provisions recognize that juvenile offenders, who have much lower rates of recidivism and have been shown to be much more amenable to treatment than their adult counterparts, shouldn't be lumped together with adult offenders.[27]

The federal legislative record does not provide any indication that Pennsylvania's registrable adjudications are tied to a high-risk of re-offense. As the Senator said, the Adam Walsh Act was a compromise which included more juveniles than those who were high-risk. The federal legislature was aware, however, that compliance with the Adam Walsh Act might very well conflict with state constitutional protections. Recognizing this, they provided an accompanying exception to the Adam Walsh Act in order to allow states the necessary leeway to abide by their own governing documents without suffering a penalty in funding.

---

[25] 29 Cong. Rec. 677-78 (March 8, 2006) (statement of Rep. Green). Available online at: http://www.gpo.gov/fdsys/pkg/CREC-2006-03-08/pdf/CREC-2006-03-08-pt1-PgH657-2.pdf#page=21.
[26] 96 Cong. Rec. 8023 (July 20, 2006) (statement of Sen. Kennedy). Available online at: http://www.gpo.gov/fdsys/pkg/CREC-2006-07-20/pdf/CREC-2006-07-20-pt1-PgS8012-2.pdf#page=12.
[27] 96 Cong. Rec. 8023 (July 20, 2006) (statement of Sen. Kennedy). Available online at: http://www.gpo.gov/fdsys/pkg/CREC-2006-07-20/pdf/CREC-2006-07-20-pt1-PgS8012-2.pdf#page=12.

Considering the legislative record, we can find no grounds on which to conclude the juvenile's adjudication-based registration is narrowly tailored. Megan's Law IV juvenile registration was simply not designed to only apply to those at a high risk of re-offense.

Accordingly, as applied to the Petitioners and for the reasons discussed above, we hold that Megan's Law IV is not narrowly tailored to its legislative goal and is unconstitutional under the Pennsylvania Constitution and in light of the protections in Art. I, § 1.

### Irrebuttable Presumption

Considering our disposition of the Petitioner's reputation claim, we will briefly analyze the related claim that Megan's Law IV creates an irrebuttable presumption.

While procedural due process is a flexible notion which calls for such protections as demanded by the individual situation, the essential requirements are notice and a meaningful opportunity to be heard. Soja v. Pennsylvania State Police, 455 A.2d 613, 615 (Pa. 1982) ("the essential elements of due process are notice and opportunity to be heard and to defend in an orderly proceeding adapted to the nature of the case before a tribunal having jurisdiction of the cause"). Due process requires not just "any" hearing, but rather an "appropriate" hearing. Fiore v. Com. of Pa., Board of Finance and Revenue, 633 A.2d 1111, 1114 (Pa. 1993). With respect to procedural due process, the U.S. Supreme Court has stated:

> The hearing required by the Due Process Clause must be 'meaningful,' and 'appropriate to the nature of the case.' It is a proposition which hardly seems to need explication that a hearing which excludes consideration of an element essential to the decision whether licenses of the nature here involved shall be suspended does not meet this standard.

Bell v. Burson, 402 U.S. 535, 541-42 (1971) (citations omitted).

Sometimes, a legislative choice based on a categorical determination from a criminal conviction is permissible. Compare De Veau v. Braisted, 363 U.S. 144, 157 (1960) (in

32

employment context, holding that law barring felony convicts from waterfront union office, if they did not have a pardon or good conduct certificate, was reasonable, based on legislative findings of corruption, and not an ex post facto law); with Johnson v. Allegheny Intermediate Unit, 59 A.3d 10, 25 (Pa. Cmwlth. Ct. 2012) (lifetime ban on employment working with children based on voluntary manslaughter conviction was not punishment under ex post facto clause; however, applying the rational basis test, law violated due process because it did not account for individual circumstances).

However, a statute may be unconstitutional if it is conditioned on an irrebuttable presumption of some pertinent fact. See Com. Dep't of Transp., Bureau of Driver Licensing v. Clayton, 684 A.2d 1060, 1063 (Pa. 1996). "[I]rrebuttable presumptions are violative of due process where the presumption is deemed not universally true and a reasonable alternative means of ascertaining that presumed fact [is] available." Clayton, 684 A.2d at 1063 (holding statute unconstitutional that rescinded license, without a pertinent hearing, following an epileptic seizure which may or may not indicate dangerousness of driver).

Regarding the irrebuttable presumption doctrine, our court has observed that it is "[un]wise to pigeonhole whether an analysis of an irrebuttable presumption is solely one of substantive or procedural due process." Id. at 1064. This is because an irrebuttable presumption claim generally challenges both the statute, i.e. the substance, and the procedure employed by the statute. Id.

In D.C. v. School Dist. of Philadelphia, the Commonwealth Court considered whether it was an irrebuttable presumption for a statute to automatically exclude certain juvenile delinquents from a school's regular classrooms. D.C. v. School Dist. of Philadelphia, 879 A.2d 408, 410 (Pa. Cmwlth. Ct. 2005). In that case, the General Assembly enacted legislation to

33

manage students who were adjudicated delinquent. Id. at 409. Any student adjudicated delinquent would not be allowed in a regular classroom, but would be placed in a transition center for one month. Id. 409-10. In accordance with the statute, the transition center would then assign the juvenile to one of four various programs designed for disruptive students. Id. at 410. The four programs had no interscholastic sports and limited scholastic opportunities. Id. Three students brought suit, challenging the statute on the basis of the irrebuttable presumption doctrine. Id. at 416. The students were all adjudicated delinquent of non-violent crimes, but behaved themselves in the rehabilitation program and when working with others. Id. at 410. Finding that due process triggered, the Court considered that the adjudicatory hearing did not decide whether the student should be excluded from the regular classroom. Id. at 418. Instead, the statute simply presumed a student must be excluded "regardless of whether the student performed in an exemplary manner during juvenile placement or otherwise does not pose a threat to the regular classroom setting." Id., 879 A.2d at 418. The statute provided no hearing for students to challenge the classroom exclusion. Id. at 419. Accordingly, the statute created an irrebuttable presumption and was stricken. Id.[28]

Reputational harm is enough to trigger the Pennsylvania Constitution's due process protections. Compare R. v. Com., Dep't of Pub. Welfare, 636 A.2d at 149 (under Pennsylvania Constitution, reputation is "a fundamental interest which cannot be abridged without compliance with constitutional standards of due process and equal protection") with Com. v. Mountain, 711 A.2d at 478 (citing federal precedent and stating "reputational damage alone has been held to be insufficient to trigger a procedural due process claim"). As we discussed above, Megan's Law IV harms the Juveniles' reputation and has triggered due process

---

[28] The students also challenged the statute on the basis that it violated their fundamental right to reputation. The Court declined to address this claim because it had already granted relief on separate due process grounds. D.C. v. Sch. Dist. of Philadelphia, 879 A.2d 408, 419 (Pa. Cmwlth. Ct. 2005).

34

protections. Thus, we will go on to determine if the law creates an irrebuttable presumption as the Petitioners claim.

Megan's Law IV creates a presumption that the Petitioners are dangerous and pose a high risk of re-offending, thus necessitating their placement on the sex offender registry. This presumption is employed after an adjudicatory hearing where the Petitioners were adjudicated delinquent of certain offenses. However, the Petitioners' registry and dangerousness are not at issue in the hearing.

Apparently recognizing that Megan's Law IV will cover juvenile delinquents who are not high risk, the legislature provides an opportunity for juvenile offenders to petition the Court to withdraw from the registry. However, a juvenile's challenge to registration may only occur after they have been subject to registration for 25 years. 42 Pa.C.S.A. § 9799.17(a)(1). This challenge will be precluded if the juvenile has been convicted for any second degree misdemeanor punishable by more than one year in prison, whether or not this conviction bears any relationship to dangerousness, sexual offenses, or the requirements of registration. 42 Pa.C.S.A. § 9799.17(a)(2).[29] The juvenile will also be on the registry for life if his court-ordered supervision is not successfully completed without revocation, regardless of the reasons or the number of years ago that occurred. 42 Pa.C.S.A. § 9799.17(a)(3). Considering the timing of this hearing and the possibly irrelevant considerations involved, we do not believe that this hearing provides a meaningful opportunity to challenge registration. Neither does Megan's Law IV provide any notice prior to the requirement to register. See 42 Pa.C.S.A. § 9799.23(a)-(d)

---

[29] For example, perhaps the juvenile, in the course of his employment, commits two violations of the Sewage System Cleaner Control Act within a two year period. The second violation will be a misdemeanor of the second degree and will preclude him from ever challenging his Megan's Law registry. 35 Pa.C.S.A. § 770.12(c).

35

(requiring notice at the time of adjudicatory hearing's disposition and also stating that failure to notify "shall not relieve the sexual offender from the requirements of this subchapter").

For these reasons, we hold that Megan's Law IV creates an irrebuttable presumption in violation of the Pennsylvania Constitution's guarantee of due process.

Petitioners' Claims One & Three: Ex-Post Facto Clause, Cruel and Unusual Punishment

Considering our disposition with respect to Claims Two and Four, we will not address the additional constitutional grounds on which the Petitioners challenge Megan's Law IV. The Petitioners' arguments regarding the ex post facto clause and the 8th Amendment are dismissed as moot.

Severability

Once a court declares part of a statute unconstitutional, it must determine whether the statute should be struck in its entirety or whether some portion of the statute may be saved by severing it. The Statutory Construction Act provides that:

> The provisions of every statute shall be severable. If any provision of any statute or the application thereof to any person or circumstance is held invalid, the remainder of the statute, and the application of such provision to other persons or circumstances, shall not be affected thereby, unless the court finds that the valid provisions of the statute are so essentially and inseparably connected with, and so depend upon, the void provision or application, that it cannot be presumed the General Assembly would have enacted the remaining valid provisions without the void one; or unless the court finds that the remaining valid provisions, standing alone, are incomplete and are incapable of being executed in accordance with the legislative intent.

1 Pa.C.S.A. § 1925.

The court must find provisions severable unless "[the] valid provisions of [the statute] are so dependent upon the [invalid] provisions that the General Assembly would not have enacted the former without the latter." Com. v. G. Williams, 832 A.2d 962, 986 (Pa. 2003) (severing unconstitutional penalty provisions from Megan's Law II). However, "[w]here a legislative

36

scheme is determined to have run afoul of constitutional mandate, it is not the role of this Court to design an alternative scheme which may pass constitutional muster." Heller v. Frankston, 475 A.2d 1291, 1296 (Pa. 1984) (going on to find inseparable link making provision not severable).

Here, we have found Megan's Law IV unconstitutional insofar as it applies to juvenile offenders who are not assessed to be sexually violent delinquent children. Megan's Law IV primarily pertains to adult sexual offenders. Ruling that the law does not apply to select juvenile offenders does not render the other provisions incomplete or incapable of being executed in accordance with the legislature's intent. As such, the provisions are severable and Megan's Law IV is not struck down in its entirety, but only insofar as it applies to juvenile offenders who are not assessed to be sexually violent delinquent children.

## CONCLUSION

In sum, as applied to the Petitioners, Megan's Law IV unconstitutionally infringes on the fundamental right to reputation and creates an irrebuttable presumption in violation of the Pennsylvania Constitution's guarantee of due process. Insofar as Megan's Law IV applies to these juvenile offenders, the law is unconstitutional and cannot stand. We will, therefore, release the Petitioners from Megan's Law registration.

Accordingly, we enter the following order: